# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

FRANK CHRISTOPHER GONZALEZ,
Defendant and Appellant.

S163643

Los Angeles County Superior Court
NA071779

December 2, 2021

Justice Groban authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Kruger, and Jenkins concurred.

PEOPLE v. GONZALEZ

S163643

Opinion of the Court by Groban, J.

A jury found defendant Frank Christopher Gonzalez guilty of first degree murder and attempted second degree robbery. (See Pen. Code, § 187, subd. (a), former §§ 189, 211, 664.)[1] The jury also found true a robbery-murder special-circumstance allegation and an allegation that defendant personally and intentionally discharged a firearm in committing the murder. (Former §§ 190.2, subd. (a)(17), 12022.53, subds. (b), (c), (d).) At the penalty phase, the jury returned a death verdict, and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).) We affirm the judgment.

## I. BACKGROUND

### A. Guilt Phase

*1. The shooting and initial investigation*

At around 6:00 a.m. on March 28, 2006, Genaro Huizar arrived at his home on Eucalyptus Avenue in Long Beach. After parking his car, he observed two men on bicycles ride past him. One of the bicycles looked like a "10-speed"; the other bike was smaller. Huizar continued walking and entered his home. Moments later he heard between three and five gunshots.

---

[1] Unless otherwise noted, all further statutory citations are to the Penal Code.

1

At around 5:45 a.m. that same day, two men were delivering newspapers on Eucalyptus Avenue when they came upon a woman lying motionless on the ground lying in front of a car with its trunk open. They attempted to perform CPR on the woman, later identified as Los Angeles County Sheriff's Department Deputy Maria Rosa, and called 911.

Officer Rosa lived in a house on Eucalyptus Avenue with her partner, Los Angeles County Sheriff's Department Detective Jenny Martin, and Martin's nephew. On the morning of the shooting, Martin was awakened by her nephew, who told her Rosa was "on the floor outside." Martin saw Rosa lying on the ground outside the house and called 911.

Long Beach Police Department Officer Robert Davenport responded to the 911 calls. When Davenport arrived at the scene he saw a red BMX-style bicycle near Rosa's body, which appeared to have a gunshot wound. The body was lying in a driveway near a car with its trunk open. Davenport looked inside the trunk and saw several items including a gun, boots and a purse. The purse was partially open.

Long Beach Police Department Detectives Patrick O'Dowd and Bryan McMahon inspected the trunk, which contained a black gym bag with a nine-millimeter Heckler and Koch handgun next to it, along with a purse and a wallet. The keys to the car were in the keyhole of the trunk. They also found Rosa's police badge, which was closed, and a firearm holster. Detective McMahon testified that the gun had a live round jammed into it that obstructed the chamber. He believed that the gun was jammed due to someone having tried to get a round into the chamber. Los Angeles County Sheriff's Department

Firearms Identification Expert Edmund Anderson agreed that the gun had malfunctioned, jammed, and failed to fire.

Los Angeles County Medical Examiner Paul Gliniecki conducted an autopsy the day after the murder. He identified two gunshot wounds, one to Rosa's upper right shoulder and a fatal wound to her left side abdomen. Both bullets were .22-caliber munitions. Gliniecki concluded that Rosa had died from internal bleeding caused by the gunshots.

Long Beach Police Department Detective David Rios secured surveillance video from a Bank of America located near the shooting and reviewed footage that had been captured between 4:00 and 7:00 a.m. on the day of the murder. The video showed two men riding on bicycles between 5:25 and 5:30 a.m. Rios generated still images of the two men, which he turned over to investigating officers. Detective O'Dowd used the images in a flier offering a reward for information about the suspects.

*2. The DNA evidence*

Kari Yoshida, a criminalist for the Los Angeles County Sheriff's Department, was able to generate a DNA profile from samples obtained from the handlebar of the bicycle found at the scene of the crime. The profile was entered into the "Combined DNA Index System (CODIS), a nationwide database that enables law enforcement to search DNA profiles collected from federal, state, and local collection programs." (*People v. Buza* (2018) 4 Cal.5th 658, 666.)

In July of 2006, the California Department of Justice informed personnel investigating Rosa's murder that Gonzalez was a potential match. Yoshida's colleague, Juli Watkins, obtained reference samples from Gonzalez and generated a DNA profile. She then compared his profile to the profile Yoshida had

generated from the bicycle and concluded Gonzalez was a possible contributor.

At trial, Watkins testified about her and Yoshida's DNA analysis. She further testified that Gonzalez could not be ruled out as a possible contributor to the sample found on the bike. Using a conservative estimate, she testified there was a one in one billion chance that a random person would share the same DNA typing with the sample found on the handlebar.

### 3. Undercover operation targeting Gonzalez and Justin Flint

Based on the DNA evidence and information obtained by confidential informants, law enforcement personnel began to focus their investigation on Gonzalez and a man named Justin Flint. Detective O'Dowd aided the Los Angeles County Sheriff's Department in conducting an undercover operation involving the two suspects, who were both incarcerated on charges unrelated to Rosa's shooting. As part of the operation, a bus outfitted with recording devices picked up Gonzalez and Flint at their respective prisons along with two groups of undercover officers posing as inmates, and then transported them to the Los Angeles County jail. Once the bus arrived at the county jail, Gonzalez and Flint were initially placed in separate cells that were also outfitted with recording devices. Undercover officers rotated in and out of each cell to create the impression that they were being processed. Eventually, Gonzalez and Flint were placed in the same cell.

An undercover agent that participated in the operation testified that when Gonzalez entered the bus and saw Flint, he became "excited in a bad way" and "almost lost control of his emotions." Another agent who was on the bus heard Gonzalez

talking to Flint about why they were being transported to Los Angeles County jail and whether it was related to the "bicycle shit." In the holding cell, Gonzalez speculated that the arrest might be related to a crime involving a car, which one of the undercover detectives understood to mean a "carjacking." Gonzalez also speculated whether the police could "squeeze" Flint into talking about the crimes.

Detective Javier Clift initiated a conversation with Gonzalez and suggested that he must have been detained because evidence was left at the crime scene. Gonzalez responded, "No, I cleaned and wiped and everything. It's just going to be he say she say." When asked about the murder weapon, Gonzalez told Clift the gun he used for the crime was "swimmin" (*sic*) and then inquired whether getting rid of the evidence was "a plus." Gonzalez told Clift there were no footprints left at the scene because he had been on concrete. Gonzalez then spoke of another incident, which Clift described as a "carjacking." Gonzalez claimed he had left no evidence behind that would connect him to the stolen car. Gonzalez also described himself as a "cappa," which Clift understood to refer to a person who had committed a crime that would subject him to capital punishment. Gonzalez mentioned disfiguring his face so that he could not be identified in a lineup, and having "special privileges" among the inmates, which Clift understood to be a reference to having committed a very serious crime such as killing a police officer.

Detective Miguel Beltran also spoke to Gonzalez. When Beltran asked about a murder that Gonzalez had supposedly committed, Gonzalez said "it was a hooda," which Beltran interpreted to be the slang for a police officer, and described the victim as a female. Gonzalez also told Beltran about a bike that

he had left at the scene and discussed creating an alibi to make the police believe the bike did not belong to him.

Gonzalez told another undercover agent, Detective Noyola, that he shot a female police officer after she had showed him her badge. Noyola also testified that when he was in the holding cell, Gonzalez told Flint not to talk to anyone "because [they were] going to ride this all the way out." While in the holding cell with Noyola, Flint said that if the "bitch" had "given up her wallet she wouldn't have been killed," but Gonzalez "bet [the police] d[id]n't have anything about [the] case."

After Gonzalez and Flint were processed and provided notice of the charges against them, including murder, they were put into a holding cell with Detective Manuel Avina. Avina talked to Gonzalez about the worst sentence for Flint, to which Gonzalez responded "life." Gonzalez and Flint wondered if someone was snitching and if they had to kill any witnesses who might testify. Gonzalez wanted to "keep Justin Flint limited in his statements" and told him to "shut up" about the murder. They strategized about how to behave during the investigation.

*4. Investigation of Jessica Rowan and Celina Gonzalez*

In addition to conducting the undercover operation, law enforcement obtained an order authorizing a wiretap on six different phone lines that were affiliated with Gonzalez and his acquaintances. Pursuant to those wiretaps, police intercepted conversations between Jessica Rowan, who had been Gonzalez's girlfriend for 12 years and was the mother of his two children, and Gonzalez's sister, Celina Gonzalez. During a phone call,

Rowan and Celina[2] discussed fabricating an alibi for Gonzalez. They agreed that they would tell police they had been at a barbeque with Gonzalez the night before the shooting and that Gonzalez then slept at Rowan's house and stayed with her the following morning.

After having intercepted those communications, Detectives McMahon and O'Dowd interviewed Rowan, who told them she was at a barbeque with Gonzalez the night before the shooting and was in bed with him on the morning of the shooting. While in Rowan's presence, O'Dowd acted as if he had received a call on his cell phone and discussed "divers going into the ocean." After getting off the phone, O'Dowd told his partner "it was in pieces," but did not specify what object he was talking about. Police also interviewed Celina, who likewise passed along the alibi that she and Rowan had discussed during their call.

After her police interview, Rowan visited Gonzalez in jail and held up a note for him to read explaining the alibi she and Celina had created. The note also stated that divers were searching for a gun. When Gonzalez read the note, he exclaimed, "Oh fuck." During subsequent phone conversations, Gonzalez told Rowan he committed the crime with the "White boy" he had purchased a computer from, whom Rowan identified as Flint. Gonzalez also directed Rowan to talk to his friend "Psycho" and tell him to deal with any potential snitches. Rowan understood this to mean that Psycho should kill any potential snitch. As directed, Rowan called Psycho and told him,

---

[2]    Because Celina Gonzalez has the same last name as the defendant, for purposes of clarity and simplicity we refer to her by her first name.

7

"If anything happens, you know what to do." Psycho responded "OK," and told Rowan not to talk about anything related to the murder over the phone.

Police eventually arrested Rowan and Celina and charged them with obstruction of justice for having fabricated a false alibi. Rowan and Celina both pleaded guilty to conspiracy to obstruct justice and their pleas included an agreement to testify against Gonzalez. Though their testimony would be considered in determining their sentence, the plea did not promise leniency in exchange for testifying.

At trial, Rowan testified that around the time of the shooting, Gonzalez told her he had "done something" in Long Beach and had to leave the city. He explained that he and a friend had tried to rob a woman to get money for drugs and a gun went off. He had demanded the victim's money and tried to grab her purse, but a struggle ensued. During the struggle, the woman pulled out a gun and a police badge and a gun discharged. He then ran from the scene.

Rowan further testified that a day or two after the shooting, she went to Celina's house with Gonzalez. Rowan stated that Gonzalez was acting nervous and strange and had said that he wanted to go to Long Beach immediately. Gonzalez then retrieved a newspaper and showed them a story about the shooting of Rosa, which included her picture, and stated, "I told you I had done something in Long Beach." A few days later Gonzalez asked to borrow Rowan's car, telling her he was driving to the beach to get rid of something. When he returned, Gonzalez told her he had gotten rid of the gun, explaining that he had sanded it down and cut it into pieces.

At some point after Gonzalez was taken into custody, Celina showed Rowan an article on the internet about the murder that included photographs of two men riding bicycles. She and Celina were worried that people would be able to identify Gonzalez in the picture from his tattoos.

Rowan also acknowledged during her testimony that she had been charged with obstruction of justice and that she and Celina had fabricated an alibi that they passed along to the police. She explained that her phone conversations with Celina and her jailhouse conversations with Gonzalez had been surreptitiously recorded. She also acknowledged that she had cooperated with law enforcement, signed a proffered statement attesting to statements Gonzalez had made about the crime and entered into an agreement to tell the truth at trial.

Celina provided testimony that was corroborative of much of Rowan's testimony. Like Rowan, Celina acknowledged she had been charged with obstruction of justice after the police intercepted a conversation in which she and Rowan had discussed fabricating an alibi. She also testified about the incident involving the newspaper that occurred at her house, explaining that Rowan and Gonzalez had been visiting her and Gonzalez was "walking around nervous." He went outside, retrieved a newspaper, and started "flipping out." There was a picture of Rosa on the front page of the paper. Gonzalez then repeatedly stated, "this is her" and that "it was a robbery that went wrong."

Celina also testified that she told police Gonzalez had said he thought he shot a female police officer. He also stated that the shooting had occurred on "Eucalyptus" and that he

approached the woman on his bicycle. He had tried to rob her because he needed money for drugs.

Gonzalez did not present any evidence at the guilt stage.

## B. Penalty Phase

### 1. *Prosecution's evidence*

At the penalty phase, the prosecution presented evidence of a number of robberies Gonzalez had allegedly committed in 1994. A witness testified about an armed robbery at a restaurant in Long Beach during which a young Hispanic male had pointed a firearm at her boyfriend and demanded his wallet. Another witness testified that he and three others had been in a parking lot located in Long Beach when three individuals robbed them at gunpoint. A liquor store owner and his brother testified that they were robbed inside their store at gun point by three individuals, one of whom fired a shotgun as he was fleeing. A man described being robbed at gunpoint by three Latino men while waiting in his car to use an ATM. Two Baskin Robbins employees described being robbed inside a Long Beach store by three armed men. A police officer who had investigated the string of robberies testified that several of the victims had identified Gonzalez as the perpetrator. A second investigating officer testified that Gonzalez admitted he had committed the four robberies and that he was "the one that usually holds the gun in the robbery." A district attorney's investigator described Gonzalez's admission to additional robberies committed during the same time period.

The prosecution also presented evidence of violent crimes Gonzalez had allegedly committed in 2006. A witness described an incident outside a restaurant in Downey in which a person had fired six or seven gunshots in the direction of a vehicle that

was driving away. Additional testimony indicated that the person who was shot at was dating Rowan and that Gonzalez had coerced Rowan into luring the man to the restaurant.

Another witness described suffering five gunshot wounds during a separate incident in Long Beach. The victim was sitting on his porch when two Hispanic men came around the corner; one of them yelled "motherfucker this is BP," a reference to "Barrio Pobre" street gang, and began shooting. An investigating detective testified that the shooting was part of an ongoing gang dispute, and that Gonzalez was a known member of Barrio Pobre. A criminalist testified that shell casings from the Downey shooting, the Long Beach shooting, and a third shooting had been fired from the same gun.

An additional witness testified that Gonzalez had pointed a gun at him and taken his keys during a carjacking. Rowan testified that Gonzalez had made statements to her about stealing a car, which she had seen him drive. The statements that Gonzalez made to Rowan about the car theft and the vehicle that she had seen him driving matched the victim's description of the carjacking incident.

The prosecution presented additional testimony about several incidents that occurred while Gonzalez was incarcerated in 2007. A deputy testified that when he was doing searches of inmates before they came to court, Gonzalez's cell door was mistakenly left open, and he attacked the deputy. Another deputy described an incident where a new inmate shouted to Gonzalez that he wanted to attack a correctional officer, and Gonzalez shouted back that he would like to help "put another notch on my belt."

The prosecution also presented extensive victim impact evidence that included testimony from several of Rosa's friends and colleagues.  An officer who worked with Rosa testified that she was a caring person who took pride in her work. Another witness described an instance when Rosa helped her after an accident as exemplary of Rosa's willingness to help others. Other friends and colleagues testified about Rosa's dedication to her work, her bright and kind personality, and the sense of loss they had felt after Rosa's death.

The prosecution also presented two family members as witnesses.  Officer Martin, who was Rosa's longtime partner, described how they had met, their plans for adopting a child and Rosa's early life in Mexico and then the United States.  She described the effort Rosa had put in to get a college degree and to become a police officer.  She also described her profound sense of loss when Rosa died.  Rosa's sister described their close sibling relationship and Rosa's early life.  She also described a period of time when Rosa and Martin took care of the sister's children so that the children might have a better life.

Finally, over an objection from the defense, the prosecution played an eight-minute victim impact video.  The video included emotional descriptions of Rosa by family, friends, and colleagues, some of whom had also testified.  At certain points in the video, individuals were shown standing in a cemetery while they described Rosa.  At other times, their descriptions were played over photo montages of Rosa.  Soft music played in the background throughout.

### 2. *Defense's evidence*

Gonzalez's paternal aunt testified that Gonzalez's father had been in prison since Gonzalez was an infant and was

currently incarcerated for murder. Two of her other brothers (Gonzalez's uncles) died in prison and a third was a gang member. When Gonzalez was a child, his mother began a relationship with another man who introduced her to heroin and his mother eventually became an addict. The aunt further testified that although she had not seen Gonzalez since he was a child, she loved him and believed he was a "good kid." She also showed a picture of Gonzalez's three children.

One of Gonzalez's paternal uncles described his criminal and family history. The uncle had gone to prison as an accessory to the murder Gonzalez's father was incarcerated for. Like other members of the Gonzalez family, the uncle and Gonzalez's father were active gang members for many years. The uncle saw Gonzalez recruited into a gang and was unable to stop it. He believed that Gonzalez had lacked a positive role model and that his mother was indifferent to whether her son spent his childhood on the street.

Another paternal aunt testified that Gonzalez's father had a drug problem that led to his incarceration when Gonzalez was three years old. After Gonzalez's father went to prison and his mother had started using heroin, Gonzalez went to live with the aunt for about eight months and improved in school. But after that brief period, he returned to living with his mother in a roach-infested building controlled by gangs. Gonzalez was sentenced to the California Youth Authority a few years after leaving his aunt's care. She told the jury that she did not want Gonzalez put to death, that she loved him, and that she felt he was a part of her.

Gonzalez's mother testified about her son's upbringing. His biological father had a drug problem but visited Gonzalez

and seemed to love him. She confirmed that she lived with another man after Gonzalez's father went to prison and had started regularly using heroin with the man. The mother stated that Gonzalez had performed well in school as a child but started getting into trouble as a teenager and became an active gang member around the age of 12 or 13. She told the jury that she loved her son and that he was a good father and a good son.

Rowan described her history with Gonzalez and his drug problem. They had raised three children together, which included two children he had fathered and a third child who had a different father; Gonzalez treated all three of the children well. Rowan explained that after Gonzalez was released from the California Youth Authority he did not know how to get a job or how to get around on his own. He had a serious drug problem that he supported through occasional jobs and by committing crimes. On cross-examination, Rowan admitted Gonzalez was often violent with her and stole purses as a means of supporting himself.

Gonzalez's father testified that he had not seen his son since he went to prison when Gonzalez was three years old. Gonzalez's father had gone to the California Youth Authority for armed robbery at the age of 17, had a drug problem and was involved in gangs. He had communicated occasionally with Gonzalez by mail but was never in a position to provide paternal guidance.

## II.  DISCUSSION

### A. Guilt Phase Issues

*1. Sufficient evidence supports the attempted robbery conviction*

Gonzalez argues that his conviction for attempted robbery must be overturned because there was insufficient evidence apart from his own out-of-court statements to satisfy the corpus delicti rule.  This rule, which "has [its] roots in the common law" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1169 (*Alvarez*)), precludes "convictions for criminal conduct not proven except by the uncorroborated extrajudicial statements of the accused.  [Citations.]  [It] is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened."  (*Ibid.*, fn. omitted.)  " 'The amount of independent proof of a crime required [to satisfy the corpus delicti rule] is quite small.'  [Citation.]  The prosecution need not adduce 'independent evidence of every physical act constituting an element of an offense.'  [Citation.]  Instead, it need only make 'some indication that the charged crime actually happened,' so as to ensure 'that the accused is not admitting to a crime that never occurred.' "  (*People v. Krebs* (2019) 8 Cal.5th 265, 317 (*Krebs*).)  "The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible."  (*Alvarez,* at p. 1171.)  We have previously applied the corpus delicti rule to inchoate crimes

such as attempted robbery. (See *People v. Ray* (1996) 13 Cal.4th 313, 342 (*Ray*).)[3]

Gonzalez contends that apart from his own extrajudicial statements, there was insufficient evidence to permit an inference that there was an attempt to rob Rosa. Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) An attempted robbery consists of two elements: (1) the

---

[3] Under the common law, the corpus delicti rule had both an evidentiary and a substantive component. As an evidentiary matter, the defendant's extrajudicial statements were inadmissible to show a crime had been committed until some additional quantum of evidence was supplied. As a substantive matter, the rule was as stated above, i.e., "every conviction must be supported by some proof of the corpus delicti aside from or in addition to [the defendant's own] statements, and that the jury must be so instructed." (*Alvarez, supra*, 27 Cal.4th at p. 1165, italics omitted; see *id.* at pp. 1168–1170.) In *Alvarez*, we held that the " 'Right to Truth-in-Evidence' provision of the Constitution[,] [e]nacted as part of Proposition 8 in 1982" (*People v. Guzman* (2019) 8 Cal.5th 673, 677 (*Guzman*)), abrogated the evidentiary aspect of the corpus delicti rule, but not its substantive aspect nor its requirement that when the prosecution relies on a defendant's extrajudicial statements, the jury must be instructed on the requirement of independent proof. (*Alvarez,* at p. 1165.) Thus, even after Proposition 8, the corpus delicti rule requires "an instruction to the jury that no person may be convicted absent evidence of the crime independent of his or her out-of-court statements" and "allows the defendant, on appeal, directly to attack the sufficiency of the prosecution's independent showing." (*Id.* at p. 1180.) There is no dispute that the jury in this case received an appropriate instruction regarding the rule.

specific intent to commit the robbery, and (2) a direct, unequivocal, overt act (beyond mere preparation) toward its commission. (*People v. Dillon* (1983) 34 Cal.3d 441, 452–453.)

Given the low quantum of proof that is required, we are satisfied that the prosecution provided the " 'minimal' " amount of independent evidence necessary to satisfy the corpus delicti rule. (*People v. Jones* (1998) 17 Cal.4th 279, 301 ["we have described [the necessary] quantum of evidence as 'slight' [citation] or 'minimal' "].) The evidence at trial showed two men were seen riding bicycles in a residential neighborhood early in the morning and gunshots were heard shortly thereafter. Around that time, surveillance video in the area captured images of Gonzalez on a bicycle. Rosa's body was found near her car, which was parked in the driveway of a residence with the trunk open and the keys hanging from the keyhole. A bicycle was lying on the ground nearby. Several items were inside the trunk, including Rosa's purse, which was partially open, and a firearm with a bullet that appeared to have been jammed inside it, and Rosa's police badge. There was no evidence of any sexual or other form of motive for the confrontation that led to Rosa's death, nor was there any evidence that the perpetrators knew the victim. A jury might reasonably conclude this evidence provides at least " ' "some indication" ' " (*Krebs, supra,* 8 Cal.5th at p. 317) that the assailants surprised Rosa while she was standing near the open trunk of her car, which contained a partially open purse, and then forcibly attempted to take her property, but killed her in an ensuing struggle and then fled.[4]

---

[4]     At trial, the prosecution presented evidence that Flint told an undercover agent Rosa would be alive if she had given up her

Our conclusion finds support in prior cases that addressed similar corpus delicti claims. In *Ray, supra,* 13 Cal.4th 313, for example, we considered whether there was sufficient evidence independent of defendants' statements to support the jury's finding that an assault had occurred during an attempted robbery. The evidence showed the two defendants, both armed and dressed in fatigues, had approached the victims as they exited an entertainment venue. The defendants then moved the victims "to a more obscure area of the parking lot." (*Id.* at p. 342.) When one of the victims resisted, he was shot; the second victim then attempted to flee and was also shot. We concluded the jury could reasonably infer from such evidence that "the perpetrators intended to steal the victims' property at gunpoint" "even though the evidence [did] not eliminate the inference that additional or different crimes were intended." (*Ibid.*)

In *People v. Valencia* (2008) 43 Cal.4th 268 (*Valencia*), we held that testimony showing an "apartment door had been broken open, and one of the persons inside was bleeding from a . . . head injury" was sufficient to "permit[] an inference of robbery." (*Id.* at p. 297.) We explained, "[a] broken-open apartment door and a man inside with a bleeding head wound suggest robbery, a very common purpose for a home invasion.

---

wallet. Although this statement provides clear corroboration that the murder occurred during an attempted robbery, multiple courts have held that "the corpus delicti [cannot] be established by the extrajudicial statements of a codefendant." (*Munoz v. Superior Court* (2020) 45 Cal.App.5th 774, 779; see *Jones v. Superior Court* (1979) 96 Cal.App.3d 390, 397.) Because we conclude there was sufficient evidence to satisfy the corpus delicti rule without reliance on Flint's statement, we need not address whether an accomplice or codefendant's extrajudicial statements may satisfy the corpus delicti rule.

Indeed, few other possible explanations for these events come to mind, and none so likely as robbery. These might not be the only possible inferences, but they are certainly reasonable inferences, which is sufficient." (*Ibid*., italics omitted.)

The evidence here — that two men with no relation to the victim were seen riding bicycles near the crime scene early in the morning, a bicycle was abandoned near the victim's body and her belongings, which included a jammed firearm and a police badge, were in an open car trunk and her purse was partially open — is at least as suggestive of robbery as the evidence at issue in *Ray* and *Valencia*.[5] While the evidence does not preclude that the perpetrators may have had a different motive, it is nonetheless sufficient to support an inference of attempted robbery.[6]

---

[5] Gonzalez argues that the fact none of Rosa's belongings were removed from the car trunk weighs against any finding of attempted robbery. However, as in both *Ray, supra,* 13 Cal.4th at pp. 341–342, and *Valencia, supra,* 43 Cal.4th at p. 297, while there was no evidence the perpetrators actually stole any property from the victims, there was nonetheless sufficient evidence to support the inference that the perpetrators' motive was robbery.

[6] In his opening brief, Gonzalez also argued that because "the prosecution did not prove the corpus delicti of the underlying felony of attempted robbery," it had likewise failed to prove "the felony murder charged based on that felony." However, in his reply brief, Gonzalez acknowledges that for crimes committed after the adoption of section 190.41 (added by Prop. 115, Primary Elec. (June 5, 1990) § 11), " 'the corpus delicti of a felony-based special circumstance . . . need not be proved independently of a defendant's extrajudicial statement.' " (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1263, fn. 1, quoting § 190.41.)

*2. The trial court did not err in admitting statements obtained during the undercover operation*

Gonzalez argues the trial court erred in admitting all statements obtained during the undercover operation that law enforcement performed while he and Flint were being transported to, and then held at, the Los Angeles County jail.[7] Gonzalez contends the statements were inadmissible because his Sixth Amendment right to counsel had attached at that time. Alternatively, he argues the delay in bringing charges against him for Rosa's murder violated his due process rights because such conduct delayed appointment of counsel. Both claims are without merit.

The right to counsel guaranteed by the Sixth Amendment does not attach until " ' "the initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." ' " (*Rothgery v. Gillespie County* (2008) 554 U.S. 191, 198; see *People v. Slayton* (2001) 26 Cal.4th 1076, 1079.) At that point, "the State's relationship with the defendant has become solidly adversarial" (*Rothgery*, at p. 202) — " 'the government has committed itself to prosecute, and . . . the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.' " (*United States v. Gouveia* (1984) 467 U.S. 180, 189 (*Gouveia*).)

---

[7] At trial, Gonzalez filed a motion to suppress any evidence obtained during the undercover operation, arguing that law enforcement's conduct violated his Fifth and Sixth Amendment rights. The trial court denied the motion.

After the Sixth Amendment right has attached, government agents may not obtain incriminating statements from a defendant about the charged crime outside the presence of defendant's counsel absent an explicit waiver. (See *Maine v. Moulton* (1985) 474 U.S. 159, 170–177.)

Here, Gonzalez made the incriminating statements over a month before the complaint was filed against him. Thus, under existing authority, Gonzalez's Sixth Amendment rights had not yet attached (and could not have been violated) when the undercover operations were performed. (Compare *People v. Clair* (1992) 2 Cal.4th 629, 658 [rejecting claim that use of undercover agent violated 6th Amend. right to counsel after the defendant had become "focus of the investigation," but had not yet been formally charged], with *Illinois v. Perkins* (1990) 496 U.S. 292, 299 ["the government may not use an undercover agent to circumvent the Sixth Amendment right to counsel once a suspect has been charged with the crime"].)

Gonzalez does not contend otherwise. Instead, he appears to argue we should adopt the Sixth Amendment test that Justice Stevens articulated in his concurring opinion in *Gouveia, supra,* 467 U.S. 180. Justice Stevens's concurrence argued that "[i]f the authorities take a person into custody in order to interrogate him or to otherwise facilitate the process of making a case against him, . . . the person is sufficiently 'accused' to be entitled to the protections of the Sixth Amendment." (*Id.* at p. 197 (conc. opn. of Stevens, J.).) If that concurrence reflected controlling law, Gonzalez would likely have a valid claim. But it does not. To the extent Gonzalez is suggesting we should revisit the "well established" (*U.S. v. Kourani* (2d Cir. 2021) 6 F.4th 345, 353) rules governing when the Sixth Amendment right to counsel commences, we decline to do so.

Gonzalez alternatively argues that the delay in bringing charges against him violated his due process rights because the delay was undertaken to gain a tactical advantage over him. "[T]he right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence." (*People v. Martinez* (2000) 22 Cal.4th 750, 767.) As our high court has explained, however, "Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." (*Hoffa v. United States* (1966) 385 U.S. 293, 310; see *United States v. Lovasco* (1977) 431 U.S. 783, 791 [prosecutors have "no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt"].) We find no merit in Gonzalez's contention that law enforcement's attempts to obtain further evidence of guilt after having probable cause to arrest him violated the Fifth Amendment right to due process.

3. *There was no abuse of discretion in denying defense counsel's request for a second continuance*

Gonzalez argues the court erred in denying his attorney's request for a second continuance of the trial.

a. *Background*

Approximately one year after defense counsel was appointed, she filed a continuance motion seeking a four-month delay of trial. The filing included a declaration describing

22

counsel's efforts in preparing for trial. The declaration also described the need for additional time to investigate recently disclosed aggravating factors and DNA discovery. The trial court held a hearing on the motion and learned that Gonzalez was not willing to waive time. Despite Gonzalez's desires, the trial court granted the motion, deciding that his right to effective assistance of counsel outweighed his statutory speedy trial right.

One month in advance of the new trial date, defense counsel filed a motion to continue the trial for another four months. In the attached declaration, which was filed under seal to protect the defense's trial strategy, counsel explained there were three avenues of investigation she had not yet completed. First, counsel stated she had not yet received "any feedback from her DNA expert." The declaration provided no time estimate as to when she expected to hear from the expert nor did it describe what exculpatory evidence she hoped to obtain (or the likelihood that such evidence would be obtained). Second, counsel stated that she needed to "obtain the services of both a psychiatrist and psychologist" for the penalty phase. Again, however, counsel provided no details regarding the expected timetable for obtaining such services or the nature of the evidence she hoped to gain. Finally, counsel asserted that there "remain[ed] other penalty phase witnesses that must be located and interviewed." No details were provided about the identity of those purported witnesses or the type of information they might have that would be relevant to the penalty phase.

At the motion hearing, defense counsel informed the court that although she had explained to Gonzalez that a continuance was in his best interest, he remained unwilling to waive time and had indicated he would seek to represent himself if a second

continuance were granted. In an exchange with the court, Gonzalez confirmed that while he understood his attorneys believed they needed more time to prepare, he was not willing to waive time. The prosecution did not object to a continuance, but noted that because of conflicting schedules, any delay would need to be for at least five months.

The court questioned whether it could find good cause for a second lengthy continuance, explaining: "[T]he defendant appears to be an intelligent young man. He understands what is going on and he understand[s] the serious nature of this case. And I found good cause in the past. I don't know if I can keep doing that in good conscience. A defendant can waive whatever right that he has if he wishes to . . . . And I don't know if I can keep finding good cause to put it over, especially for the amount of time that [we are] talking about. [¶] . . . [¶] . . . . [We are] talking about five months. . . . I find that to be a difficult thing for me to do when he refuses to waive time." In response, defense counsel acknowledged that she "under[stood] the court's concern" but felt an "obligation" to seek a continuance because she did not feel she would be prepared on mitigation. The court then denied the motion, explaining, "I cannot find good cause for a five-month continuance when the defendant refuses to waive time. All I can say is whatever needs to be done must be done expeditiously."

### b. Discussion

We review a trial court's order denying a motion to continue for abuse of discretion. (See *People v. Jackson* (2009) 45 Cal.4th 662, 677–678; see also *People v. Beames* (2007) 40 Cal.4th 907, 920 ["[A]n order denying a continuance is seldom successfully attacked"]; Cal. Rules of Court, rule 4.113 ["Motions

24

to continue the trial of a criminal case are disfavored"].) A trial court's discretion "may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." (*People v. Sakarias* (2000) 22 Cal.4th 596, 646.) The court "must consider ' " 'not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.' " ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 450 (*Doolin*).)

Under the unusual circumstances presented here, we conclude the trial court did not abuse its discretion in determining that substantial justice would not be accomplished by granting the second motion for a continuance. While a court facing a continuance request must normally weigh the anticipated benefit to the defendant against the burdens the continuance would have on other participants in the trial (see *Doolin, supra,* 45 Cal.4th at p. 450), there was another factor to consider in this case: Gonzalez had repeatedly stated that he was against a continuance, implicating not only his statutory right to a speedy trial but his constitutional rights. (See U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Townsend v. Superior Court* (1975) 15 Cal.3d 774, 781 (*Townsend*) ["The right to a speedy trial is undeniably 'as fundamental as any of the rights secured by the Sixth Amendment' [citation], and . . . counsel may not waive this constitutional right over his client's objections" (italics omitted)].)

Further complicating matters, defense counsel informed the court that Gonzalez had indicated he would choose to represent himself in the event of a second continuance. The trial court might reasonably conclude that whatever benefits could be

gained from an additional five-month delay were substantially outweighed by the risks associated with self-representation in a capital matter. Moreover, the declaration defense counsel provided in support of the continuance motion was vague, failing to explain with any specificity the type of exculpatory evidence she hoped to gain from her further investigation or the likelihood that she would in fact obtain such evidence. (See *Doolin, supra,* 45 Cal.4th at p. 451 ["defendant's vague . . . reasons for the continuance failed to support good cause"].)

On the record presented here, we cannot conclude that the trial court abused its discretion in attempting to balance the right to effective counsel versus the asserted right to a speedy trial by granting one continuance over defendant's objection, but not two. (See *Townsend, supra,* 15 Cal.3d at p. 784 ["counsel [does not] possess[] carte blanche under any and all conditions to postpone his client's trial indefinitely"].)

### 4. *The wiretap application was not facially invalid*

Gonzalez argues the trial court should have suppressed any evidence derived from communications that law enforcement intercepted pursuant to the wiretap order. As discussed in more detail below, John Spillane, the chief deputy district attorney for Los Angeles County, signed the wiretap application and attested that he was "the person designated to act as District Attorney in [District Attorney Steve Cooley's] absence." Although California's wiretap law expressly allows for such designation (see § 629.50, subd. (a)), Gonzalez contends the application was nonetheless invalid because it failed to include information describing the circumstances of District Attorney Cooley's absence. Gonzalez argues that without such

26

information, there is no way to verify whether Cooley was truly absent at the time Spillane filed the application. We find nothing in the wiretap statute that imposes such a requirement.

### a. Background
#### (i) The trial court proceedings

In August 2006, Chief Deputy District Attorney John Spillane filed an application for an order authorizing wiretaps on several phones affiliated with Gonzalez. The application included a declaration, made under penalty of perjury, from Spillane stating, "Steve Cooley is the District Attorney of the County of Los Angeles and I am the person designated to act as District Attorney in his absence pursuant to Penal Code [s]ection 629.50[, subdivision ](a)." The declaration also stated Spillane had reviewed an attached 37-page affidavit from detective Thomas Kerfoot that provided background information regarding the investigation and explained the need for the wiretaps. Spillane further attested that he agreed the wiretaps were both necessary and likely to intercept communications related to Rosa's murder. The application also included a signed attestation from Long Beach Police Department Chief Anthony Betts confirming that he had reviewed Kerfoot's affidavit and had approved the application.

Prior to trial, Gonzalez filed a motion arguing that any evidence derived from the wiretaps should be suppressed because Spillane's application did not include any information confirming that District Attorney Cooley was absent when Spillane had sought the order. Gonzalez's motion contended that the district attorney's office had attempted to "take advantage of an ambiguity" in the statutory provision that authorizes a person designated to act in the district attorney's

absence to seek a wiretap application.  That provision, set forth in section 629.50, subdivision (a) (section 629.50(a)) states, in relevant part:  "Each application for an order authorizing the interception of a wire or electronic communication shall be made in writing upon the personal oath or affirmation of . . . a district attorney, or the person designated to act as district attorney in the district attorney's absence."

Gonzalez argued the language in section 629.50(a) could be construed in one of two ways.  First, it could mean that the person designated to act as district attorney in the district attorney's absence can only seek an application when the district attorney is actually absent; second, it could mean that if a person has been designated to act as the district attorney when the district attorney is absent, he or she can seek an application even when the district attorney is present.  Gonzalez argued that the first interpretation was the correct reading, explaining that "[w]hile the urgent nature of criminal investigations may explain why the legislature provided for a delegate in the case of the district attorney's absence, there is no justification for allowing such delegation when the district attorney is present and capable of filing the application."

Gonzalez further contended that based on the wording of the wiretap application, it was unclear whether District Attorney Cooley was truly absent when Spillane had sought the order.  According to Gonzalez, Spillane's declaration stated only that he was " 'the person designated to act as District Attorney in [Steve Cooley's] absence,' but ma[de] no assertion whatsoever regarding Cooley's actual absence from his position."  Gonzalez further argued that because the "government ha[d] made no showing that Cooley was, in fact, absent when the application . . . was approved . . . , that application and the

ultimate wiretap authorization are invalid and illegal." Gonzalez did not present any argument as to the meaning of the term "absent" nor did he produce any evidence suggesting that District Attorney Cooley was not absent when Spillane signed the application as the person designated to act in Cooley's absence.[8]

In its opposition to the motion to suppress, the prosecution did not dispute that section 629.50(a) authorizes the designee to act only when the district attorney is absent. Acknowledging that few cases had addressed the requirements of section 629.50(a), the prosecution contended that the designation provision "allows a District Attorney, whose responsibilities are many, especially in a County the size of Los Angeles, to designate someone to act" in his or her absence with respect to wiretap applications, and "recognizes the numerous and varied duties of a District Attorney . . . [by] allow[ing] for another to take on wiretap application responsibilities." The prosecution then quoted three dictionary definitions of the term "absence," which included " 'the state of being away from place or person' "; " 'the duration of being away' " and " 'not present.' " The prosecution further asserted that Spillane's declaration made clear that the "District Attorney was absent and designated his responsibility for review [*sic*]. . . . The statute could have but did not require [District Attorney Cooley] or his designate to provide documentation or explanation. In the absence of such

---

[8] Gonzalez also argued the application was invalid because there were factual inconsistencies regarding the date on which Long Beach Police Department Chief Anthony Betts signed his affidavit stating that he had reviewed and approved the application. Gonzalez has not raised that claim on appeal.

statutory provision, we must presume the Legislature did not intend to require such proof."

At the suppression hearing, defense counsel argued "the problem" was that although section 629.50(a) made "clear that someone else c[ould] only act if Cooley [wa]s absent," the application contained "nothing to indicate" Cooley was actually absent when Spillane sought the order. Defense counsel contended that "everybody knows what absent means," noting that the prosecutor "went through in her opposition papers to explain the meaning and so forth." Counsel acknowledged that the "statute does not specifically" require the applicant to include such information in the application, but argued it was nonetheless "incumbent upon the prosecution, not the defense, to establish that he was absent. So . . . with that application, it would be inappropriate absent showing that Cooley was, in fact absent . . . before [Spillane] could provide that application."

In response, the prosecution argued defense counsel's contention that the district attorney must "prove [he was absent] and . . . need[s] to document why he's absent" found no support "under the statute" or in the "case law." The prosecution further argued that Spillane's under-oath statement that he was the person designated to act as district attorney when Cooley was absent provided "prima facie evidence" that he was properly designated; the wiretap statute required nothing more.

The trial court agreed with the prosecution, concluding that section 629.50(a) "provide[d] for" exactly the type of oath Spillane had made in his declaration and did not include any further "requirement . . . that there be proof that [the district attorney was] absent." The court further commented that it could not "imagine the Legislature" requiring the district

attorney or the designee to document the circumstances of the absence "each time the chief of any agency is out of town," describing such a requirement as "onerous" and "unnecessary."

(*ii*) *Proceedings on appeal*

On appeal, Gonzalez reiterates his argument that the wiretap application was invalid because "there was no proof that the elected district attorney of Los Angeles County, Steven Cooley, was actually absent from his position when his Chief Deputy, John Spillane, made the application." His brief discusses at length *United States v. Perez-Valencia* (9th Cir 2013) 727 F.3d 852 (*Perez-Valencia*), a Ninth Circuit decision interpretating section 629.50(a)'s designation provision that was decided several years after Gonzalez's trial. *Perez-Valencia* addresses the scope of authority a subordinate must be delegated in order to seek a wiretap in the district attorney's absence, an issue Gonzalez did not raise in the trial court. The Ninth Circuit concluded that the phrase "the person designated to act as district attorney in the district attorney's absence" requires that the designee "must be acting in the district attorney's absence not just as an assistant district attorney designated with the limited authority to apply for a wiretap order, but as an assistant district attorney duly designated to act for *all* purposes as the district attorney of the political subdivision in question." (*Perez-Valencia*, at p. 855.) Noting that the prosecution's opposition to the motion to suppress appeared to interpret the requirements of section 629.50(a) differently than *Perez-Valencia,* Gonzalez argues that the application here was invalid because "there was no evidence presented . . . as to either the nature of District Attorney Cooley's absence or the nature of the authority of Chief Deputy Spillane."

At oral argument, Gonzalez's counsel confirmed defendant's argument with respect to the wiretap order is that the application was facially invalid because it failed to include information verifying that the district attorney was absent.[9] Thus, the issue we must decide is whether it is sufficient for a wiretap application to state, as here, that it has been submitted upon the oath of "the person designated to act as district attorney in the district attorney's absence" (§ 629.50(a)), or whether section 629.50 also requires that an application include information detailing the specific circumstances of the district attorney's absence.

### b. *Discussion*

#### (i) *Summary of federal and state wiretap laws*

Title III of the federal Omnibus Crime Control and Safe Streets Act of 1968 (Title III) (18 U.S.C. §§ 2510–2520) " 'provides a "comprehensive scheme for the regulation of wiretapping and electronic surveillance." ' [Citation.] As we have previously observed, Title III 'establishes minimum standards for the admissibility of evidence procured through electronic surveillance; state law cannot be less protective of privacy than the federal Act.' " (*People v. Leon* (2007) 40 Cal.4th 376, 384 (*Leon*); see *Villa v. Maricopa County* (9th Cir. 2017) 865 F.3d 1224, 1230 (*Villa*) ["States may choose to enact wiretapping

---

**9** Appellate counsel acknowledged that if this court did not accept the "argument that more had to be said on the face of the application itself," there was no basis for relief. Counsel also confirmed that Gonzalez's argument was not related to anything the prosecution said "in [its] response to the motion to suppress or [at the suppression] hearing."

statutes imposing more stringent requirements, or . . . choose to forego state-authorized wiretapping altogether"].)

Title III allows states to authorize only the following categories of law enforcement officials to seek a wiretap order: "The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State . . . ." (18 U.S.C. § 2516(2).) Pursuant to that provision, California's wiretap law (Pen. Code, § 629.50 et seq.) provides that "[e]ach application for an order authorizing the interception of a wire or electronic communication shall be made in writing upon the personal oath or affirmation of the Attorney General . . . or a district attorney, or the person designated to act as district attorney in the district attorney's absence." (§ 629.50(a).)[10]

Section 629.50(a) sets forth a detailed description of additional categories of information a wiretap application must contain, including (among other things) the identity of the applicant, the identity of the agency that will carry out the wiretap, the facts and circumstances demonstrating the need for

---

[10] Although 18 United States Code section 2516(2) only refers to "the principal prosecuting attorney of any political subdivision," courts have held that this language does not preclude states from authorizing a district attorney to delegate wiretap authority to a subordinate when absent. (See *U.S. v. Fury* (2d Cir.1977) 554 F.2d 522, 527, fn. 4 (*Fury*) [" 'Congress simply could not have intended that local wiretap activity would be completely suspended during the absence or disability of the official specifically named [in § 2516(2)]' "]; *Perez-Valencia, supra,* 727 F.3d at p. 854.)

the warrant and the period of time the wiretap will be used. (See § 629.50(a)(1)–(4).)

> (*ii*) Section *629.50(a) does not require that the application describe the circumstances of the district attorney's absence*

Gonzalez argues that the wiretap application filed in this case was invalid because it did not include any information confirming the circumstances of District Attorney Steve Cooley's absence. But as defense counsel acknowledged at the suppression hearing, there is no language in California's wiretap laws that imposes such a requirement. Instead, the designation provision states only that an application for a wiretap order "shall be made in writing upon the personal oath or affirmation of . . . a district attorney, or the person designated to act as district attorney in the district attorney's absence." (§ 629.50(a).)

In contrast to section 629.50(a)'s designation provision, other sections of the wiretap statute *do* require that the application include information verifying certain standards have been met. In particular, section 629.50(a)(4) requires that the applicant provide a "full and complete statement of the facts and circumstances relied upon to justify his or her belief that an order should be issued." That "full and complete statement" must include, among other things, a description of the offense that is being investigated, an explanation why conventional investigative techniques are insufficient, a description of the type of communications that are expected to be intercepted, and the identity of the persons whose communications are expected to be intercepted. (*Ibid.*)

Had the Legislature intended to impose a similar requirement compelling the application to include a "full and complete statement of the facts" confirming the circumstances of the district attorney's absence, it could have directed as much. But that is not what the Legislature did. Instead, it required only that the application must "be made in writing upon the personal oath or affirmation of . . . a district attorney, or the person designated to act as district attorney in the district attorney's absence." (§ 629.50(a).) The application from Chief Deputy Spillane includes an oath that incorporates that exact statutory language. The express provisions of the wiretap statute require nothing more.

Gonzalez has likewise cited no case holding that a wiretap applicant who claims to have been lawfully designated to seek the application has a sua sponte duty to provide information confirming the legality of that designation. Indeed, the few cases we have found addressing similar claims have rejected such arguments. (See *U.S. v. Terry* (2d Cir. 1983) 702 F.2d 299, 311 [rejecting claim that application was invalid because it failed to include information showing that three assistant attorneys general with higher priority than the applicant "were absent or otherwise unavailable"]; *U.S. v. Ruiz* (S.D.N.Y., Nov. 19, 2010, No. 09 CR. 719 (DAB)) 2010 U.S. Dist. Lexis 123991, pp. *13–*14 [§ 629.50(a) does not "impose a burden on investigative agencies or prosecutors to . . . prove they were absent when a designee acts on their behalf"]; *U.S. v. Mattingly* (W.D.Ky., July 1, 2016, No. 3:15-CR-99-DJH) 2016 U.S. Dist. Lexis 86489, pp. *19–*20 ["Because [defendant] has failed to present competent and credible evidence, as opposed to mere speculation, that [district attorney] was in fact available and reachable when [the designated acting district attorney]

35

submitted the application . . ., suppression is not warranted on the ground that the wiretaps were improperly authorized"].) These cases are in accord with the general principle that, "absen[t] . . . evidence to the contrary, it is presumed that official duty has been properly performed." (*Roelfsema v. Department of Motor Vehicles* (1995) 41 Cal.App.4th 871, 879 [relying on Evid. Code, § 664]; cf. *Terry, supra,* 702 F.2d at p. 311 ["a named designee whose high office [gives] him statutory power to authorize electronic surveillance orders is presumed to have properly exercised that power and the condition[s] precedent [are] presumed to have been met unless the defendants offer evidence, apart from mere conjecture or speculation, to rebut this presumption"]; *People v. Davis* (2008) 168 Cal.App.4th 617, 630 [because the " ' defendant bears the burden of proving that a wiretap is invalid once it has been authorized,' " "the failure to bring a timely challenge to wiretap evidence forfeits the claim"].)

The primary authority Gonzalez discusses in his appellate briefing is *Perez-Valencia, supra*, 727 F.3d 852, a case decided long after his trial was completed. However, nothing in *Perez-Valencia* suggests section 629.50(a) requires that an application submitted under the oath of a designated acting district attorney must include information verifying the circumstances of the district attorney's absence. Instead, as explained above, *Perez-Valencia* interpreted the scope of authority that a designated subordinate must have in order to seek a wiretap order under section 629.50(a), concluding the provision only applies when the district attorney has "duly designated [a single subordinate] to act for all purposes as the district attorney of the political subdivision in question." (*Perez-Valencia*, at p 855, italics omitted.) While that interpretation is consistent with both the wording of section 629.50(a) — the "district attorney or

*the person* designated to act as district attorney" (italics added) — and the language of Title III, which contemplates that only one "principal prosecuting attorney" will have wiretap authority at any given time (see 18 U.S.C. § 2516(2) [states may authorize *"the principal prosecuting attorney* of any political subdivision thereof" (italics added)]; *Fury, supra*, 554 F.2d at p. 527, fn. 4 [state law authorizing district attorney to designate subordinate to act in his or her absence was permissible under Title III because "[t]here is still only one person who has the authority [to act]"]), it is not relevant to Gonzalez's claim that the government was required to submit "proof" beyond Spillane's attestation confirming that "the elected district attorney . . . was actually absent from his position." *Perez-Valencia* provides no guidance on that question.[11]

---

[11]     At the suppression hearing, the trial court commented that it did not believe the term "absent" in section 629.50(a) was limited to situations where the district attorney was "out [of] town [or] out of state," but could also apply where the district attorney was "involved in doing other things" and "not available to do this type of work." The prosecution agreed, asserting that the statute "simply means not present and not available, but it doesn't mean physically in another jurisdiction." In its opposition to the motion to suppress, the prosecution also asserted, among other things, that the statute "recognizes the numerous and varied duties of a District Attorney . . . [by] allow[ing] for another to take on wiretap application responsibilities." (See *ante*, at p. 29.)

While some of those comments could be construed to endorse a broader interpretation of section 629.50(a) than the Ninth Circuit articulated in *Perez-Valencia, supra*, 727 F.3d 852, their meaning is not entirely clear in context. In any event, defense counsel did not voice any objection to the trial court's statements (or the prosecution's statements) regarding what

Gonzalez appears to argue that we should require the application to confirm the circumstances of the district attorney's absence because merely incorporating the designation standard set forth in section 629.50(a) leaves ambiguity as to whether the district attorney was truly absent. As we understand it, Gonzalez's position is that a statement like the one in Spillane's application (which tracks the statutory language) does not attest that the district attorney *was actually absent*; instead, it attests only that the applicant is the person designated to act as district attorney when the district attorney is absent. Thus, it leaves open the possibility that the applicant is merely stating that he or she is the person who is designated to act when the district attorney is absent, not that the district attorney was absent when the application was filed.

We think it clear, however, that when an applicant such as Spillane attests, "Steve Cooley is the District Attorney of the County of Los Angeles, and I am the person designated to act as District Attorney in his absence pursuant to Penal Code [s]ection 629.50(a)," that statement is most reasonably construed as a declaration that the district attorney is in fact absent. Indeed, the wording of Spillane's oath quite logically

"absent" means, nor did counsel offer an alternative interpretation. Instead, counsel argued only that the wiretap application was invalid because it did not contain any information substantiating that the district attorney was absent. At oral argument, appellate counsel confirmed that Gonzalez raises the same challenge before this court. Accordingly, we have no occasion to consider the precise circumstances under which a district attorney is considered "absent" under section 629.50(a) or otherwise address the scope of authority that the statute requires the district attorney to delegate to a subordinate when absent.

tracked the language of section 629.50(a) almost verbatim (see § 629.50(a) [application "shall be made in writing upon the personal oath or affirmation of the . . . district attorney, or *the person designated to act as district attorney in the district attorney's absence*" (italics added)].)[12] Moreover, in this case, the prosecution confirmed to the trial court that the statement was intended to convey the "District Attorney was absent and designated his responsibility for review." Contrary to Gonzalez's suggestion, we do not believe Spillane's use of the very oath that is set forth in the wiretap statute casts doubt upon whether the district attorney truly was absent, thereby necessitating some further evidentiary showing.

In sum, we decline to read into section 629.50(a) a requirement that when a person designated to act as district attorney in the district attorney's absence seeks a wiretap order, the application must include information that explains the circumstances of the district attorney's absence. (See *People ex rel. Gwinn v. Kothari* (2000) 83 Cal.App.4th 759, 768 ["In construing a statute, we do not insert words into it as this would 'violate the cardinal rule that courts may not add provisions to a statute' " (quoting *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 827)].) If the Legislature believes these additional safeguards would be prudent to ensure that law enforcement is operating

---

[12] Especially when read against the backdrop of the federal law it implements, the language of section 629.50(a) is naturally understood to require that the affirmation come from either the "principal prosecuting attorney" in the relevant jurisdiction (18 U.S.C. § 2516(2)) or the person who is acting as principal prosecuting attorney during the principal prosecuting attorney's period of absence. (See *Fury, supra*, 554 F.2d at p. 527, fn. 4.)

within the limitations of section 629.50(a), it is of course free to amend the statute accordingly.

### 5. *Any violation of Gonzalez's right to confrontation was harmless*

Gonzalez argues the trial court's admission of certain testimony related to the DNA evidence violated his rights under the confrontation clause of the Sixth Amendment to the United States Constitution. Although the merits of Gonzalez's claim are difficult to assess given the divided state of the high court's current confrontation clause jurisprudence, we conclude that any Sixth Amendment violation that may have occurred in this case was harmless beyond a reasonable doubt. (See *People v. Bryant, Smith, and Wheeler* (2014) 60 Cal.4th 335, 395 (*Bryant*) [confrontation clause violations are subject to federal harmless error standard enunciated in *Chapman v. California* (1967) 386 U.S. 18].)

### a. *Background*

Juli Watkins, a criminalist for the Los Angeles County Sheriff's Department, obtained genetic samples from the bicycle that was left near the scene of the shooting. She also received a reference sample from Rosa. Watkins was able to generate a DNA profile of Rosa, but the samples from the bicycle were contaminated and unusable. Watkins's colleague, Kari Yoshida, collected new samples from the bicycle and was able to generate a DNA profile of a contributor to one of those samples. In July 2006, Watkins and Yoshida co-authored and signed a report describing the analyses they had each performed to date.

After receiving notification that Gonzalez was a possible match to the DNA from the bicycle sample, Watkins obtained a reference sample from him and generated a DNA profile. She

then compared that profile to the profile Yoshida had generated from the bicycle sample and concluded Gonzalez was a possible contributor. Watkins prepared a supplement report that estimated the chances a randomly selected person would be a possible contributor to the profile generated from the bicycle were one out of three billion Caucasians, one out of 14 billion African-Americans and one out of one billion Hispanics. A copy of the supplemental report was introduced at trial.

Watkins testified at the trial, but Yoshida did not. Watkins explained the roles she and Yoshida had each played in producing the relevant DNA evidence. Watkins also testified as to her determination that Gonzalez was a possible contributor to the bicycle sample. When asked, "How common would it be for a person to have been included as a possible contributor," Watkins answered, "A conservative statistic . . . was estimated to be one out of one billion."

### b. Any confrontation clause violation was harmless

Gonzalez argues the trial court committed two evidentiary errors that violated his rights under the confrontation clause. First, it allowed Watkins to testify about the DNA analysis that her colleague, Yoshida, had conducted on the bicycle, which resulted in the profile that Watkins ultimately determined to be a possible match with Gonzalez's profile. Second, the court admitted into evidence a report that included Yoshida's analysis.

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Crawford v. Washington* (2004) 541 U.S. 36, 42.) "*Crawford* held that the clause bars introduction of 'testimonial' hearsay

against a defendant unless the witness is unavailable and the defendant had a prior opportunity for cross-examination." (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 911–912 (*Amezcua*).)  The question of whether and when statements in technical reports qualify as "testimonial hearsay" remains an evolving area of the law.  (See *id.* at p. 912.)

In 2012, this court issued three companion cases that addressed confrontation clause claims involving testimony detailing the results of technical reports that had been prepared by a nontestifying witness.  (See *People v. Lopez* (2012) 55 Cal.4th 569; *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*); *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*).) Those cases generated numerous separate opinions, reflecting the fragmented nature of the high court's reasoning in this area. (See *Dungo*, at p. 616 ["Sixth Amendment confrontation right issue [was] far from easy to resolve in light of the widely divergent views expressed by the justices of the United States Supreme Court in . . . recent . . . cases"]; *id.* at p. 628 (conc. opn. of Chin, J.) [concluding that it is "difficult to determine what to make" of high court's confrontation clause jurisprudence]; *Lopez,* at p. 590 (dis. opn. of Liu, J.) [the multitude of opinions in *Lopez*, *Dungo*, and *Rutterschmidt* reflected "the muddled state of current doctrine concerning the Sixth Amendment right of criminal defendants to confront the state's witnesses against them"].)  More recently, we have noted that " 'considerable flux' [continues to] surround[] the high court's Sixth Amendment jurisprudence" (*People v. Schultz* (2020) 10 Cal.5th 623, 660, fn. 8), and that "[a] comprehensive definition of the term 'testimonial' awaits articulation." (*Amezcua, supra,* 6 Cal.5th at p. 912.)

We need not delve further into the high court's divided confrontation clause jurisprudence because even if a Sixth Amendment violation is assumed, " 'it [is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " (*People v. Geier* (2007) 41 Cal.4th 555, 608 [describing the harmless error standard applicable to a claim challenging the admission of DNA evidence under the confrontation clause]; see *Rutterschmidt, supra*, 55 Cal.4th at p. 661 ["Violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless"].) As we have previously observed, DNA analysis is a powerful form of evidence that can (and often will) be highly prejudicial to the defendant. (See *Dungo, supra*, 55 Cal.4th at p. 631 [" 'a DNA profile may provide powerful incriminating evidence' " (quoting *Williams v. Illinois* (2012) 567 U.S. 50, 85 (plur. opn. of Alito, J.))]; see also *U.S. v. Barton* (11th Cir. 2018) 909 F.3d 1323, 1338 ["DNA evidence is powerful and it could be highly prejudicial"].) However, even when highly prejudicial, the erroneous admission of DNA analysis may still be deemed harmless where the remaining evidence is so overwhelming as to leave no reasonable doubt as to the defendant's guilt. (See *Geier, supra*, 41 Cal.4th at p. 608 ["any error in the admission of DNA evidence was harmless beyond a reasonable doubt"]; cf. *Doolin, supra,* 45 Cal.4th at p. 448 [although admission of DNA evidence violated state evidentiary law, the error was harmless "in light of the overwhelming and uncontradicted evidence of defendant's guilt"].) We believe this is such a case.

The prosecution's case against Gonzalez centered on two categories of highly incriminating evidence that were

independent of the DNA analysis: (1) statements that Gonzalez and Flint made to law enforcement agents who were posing as inmates during a sophisticated undercover operation; and (2) admissions that Gonzalez made to his longtime girlfriend and sister regarding his commission of the offense. The quantity and quality of that evidence was prodigious.

During the undercover operation, most of which was recorded, Gonzalez informed multiple agents that he had shot a female police officer. Gonzalez also disclosed numerous details about the crime, explaining (among other things) that he had left a bicycle at the scene, that he had thrown the murder weapon into the water and that he had not left any footprints because the crime occurred on pavement. Gonzalez and Flint were also heard discussing killing any witnesses to the murder, and Flint stated that the victim would not have been killed if she had given up her wallet.

Gonzalez's girlfriend and sister provided additional, highly incriminating testimony. Rowan and Celina both explained they had pleaded guilty to obstruction of justice after law enforcement intercepted conversations in which they were heard fabricating an alibi for Gonzalez. They both testified that Gonzalez had admitted he shot a female police officer and showed them a newspaper with a story about the crime. Rowan also testified that Gonzalez told her he left a bicycle at the scene of the crime and had thrown the murder weapon into the ocean. Rowan further acknowledged that law enforcement had recorded incriminating conversations she had with Gonzalez while visiting him in prison. During those recorded conversations, Gonzalez instructed her to contact an acquaintance and ask him to take care of any possible snitches;

he also exclaimed "oh fuck" after Rowan informed him that police divers were searching for the murder weapon.

Given this highly incriminating additional evidence of guilt, we are persuaded beyond a reasonable doubt that the jury would have returned the same verdict even in the absence of the DNA evidence.

### 6. *Gonzalez has failed to establish prosecutorial or judicial misconduct*

Gonzalez argues the prosecution violated his due process rights by asking two key witnesses — Rowan and Celina — a series of leading questions. He contends the prosecution and the trial court committed a second due process violation by coercing those witnesses to say what the prosecutor wanted them to say. Both claims lack merit.

#### *a. Background*

Rowan and Celina were both charged with conspiracy to obstruct justice for having falsified an alibi for Gonzalez. Rowan entered a guilty plea with an agreed upon sentence of up to three years depending on the judge's assessment of her veracity in testifying at Gonzalez's trial. Celina likewise pleaded guilty with her agreed upon sentence contingent on testifying truthfully at trial.

During her direct examination at trial, Rowan acknowledged that she had previously testified in the case and was facing sentencing for her obstruction charge. Through much of the examination, the prosecutor asked questions consisting of declarative statements followed by, "isn't that correct?" The prosecutor and the judge also repeatedly admonished Rowan that she should answer the questions that had been asked, and the judge gave Rowan's attorney an

opportunity to remind her of the importance of testifying truthfully.

Similarly, in questioning Celina, the prosecutor asked a series of narrative questions which she answered through "yes" or "no" answers. Among other topics, the prosecutor asked Celina about her conversations with police following her arrest and repeatedly reminded her that she was under oath and had to tell the truth. When Celina answered one such question with a question — "Why do you keep asking me? He didn't tell me directly" — the trial court admonished her not to ask questions and invited Celina's counsel to talk with her. Outside the presence of the jury, the court also reminded Celina that she was under oath and then encouraged the prosecutor to refresh Celina's memory. When defense counsel objected that the court was intimidating Celina, the judge replied, "Number one, she will not ask questions of anybody. And number two, she shall tell the truth, period. It's that simple. That's not intimidation. That's doing what's right." Following the exchange, Celina repeatedly responded "yes" to a series of questions about what she had previously told law enforcement about the crime.

### b. *Discussion*

#### (i) *The prosecution's use of leading questions*

Gonzalez first argues that the prosecution's decision to rely on leading questions during the direct examination of Rowan and Celina constituted prosecutorial misconduct. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state

law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).) A trial court's decision to allow leading questions is reviewed for abuse of discretion. (See *People v. Friend* (2009) 47 Cal.4th 1, 39.)[13]

As a general matter, a "leading question may not be asked of a witness on direct or redirect examination." (Evid. Code, § 767, subd. (a)(1).) " ' "A 'leading question' is a question that suggests to the witness the answer that the examining party desires." [Citation.] Questions calling for a "yes" or "no" answer are not leading unless they are unduly suggestive under the circumstances.' " (*People v. Collins* (2010) 49 Cal.4th 175, 214.) However, " ' "leading questions are not always impermissible on direct examination." ' " (*Ibid*.) The Evidence Code permits their use "under special circumstances where the interests of justice otherwise require." (Evid. Code, § 767, subd. (a)(1).) Applying that exception, we have previously held that leading questions are permissible when they "serve[] 'to stimulate or revive [the witness's] recollection' " (*People v. Williams* (1997) 16 Cal.4th 635, 672), or when the examining party is faced with a hostile witness. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1319 [prosecutor's "use of leading questions, which necessarily included stating facts she assumed the witness would affirm or

---

[13] It is unclear from Gonzalez's briefing whether he is arguing that the use of leading questions constituted a form of prosecutorial misconduct or that the trial court erred in permitting such questioning or both. However, as discussed below, regardless of the specific nature of his claim, we find no error on the part of either the trial court or the prosecution with respect to the use of leading questions.

deny, was justified because [the witness] was . . . obviously hostile"].) Trial courts have broad discretion to decide when such special circumstances are present. (See *Williams,* at p. 672.)

While some of the prosecutor's questions were leading, we find that the method of questioning did not constitute misconduct nor did the trial court abuse its discretion in allowing the interrogation to proceed in such a manner. The transcript shows that on many occasions, Rowan and Celina claimed not to remember (or were willfully refusing to recall) details about the prior statements they had made regarding the crime. Indeed, at one point, Gonzalez's own counsel acknowledged Celina appeared to have difficulty remembering precise details of events that had happened several years ago.

The record also supports an inference that Rowan and Celina were sufficiently "hostile" to permit leading questioning. Indeed, both witnesses acknowledged at the outset that it was difficult for them to testify. Moreover, both witnesses had a close relationship with Gonzalez and had previously lied to police to protect him. Given the witnesses' purported difficulty in remembering what had occurred, the obvious inconsistencies between their trial testimony and their prior statements to police and their close relationship to Gonzalez, we find no error in either the trial court's decision to allow leading questions or the prosecution's use of such questions.

(*ii*) *Admonishments to tell the truth*

Gonzalez next contends that the trial court and the prosecution unlawfully coerced Rowan and Celina into providing testimony favorable to the prosecution. He identifies several distinct categories of alleged misconduct, including: (1)

on multiple occasions, both the trial court and the prosecution reminded the witnesses they were testifying under oath and were required to tell the truth; (2) after the witnesses had repeatedly claimed they could not remember an event, the court invited their attorneys to speak with them about answering questions truthfully;[14] (3) the prosecutor reminded Rowan of prior statements she had made during the investigation; (4) when presented with testimony that was inconsistent with prior statements made during the investigation, the prosecution asked Rowan if she understood that she was looking at three years in prison.

We first consider whether the trial court engaged in unlawful coercion by reminding the witnesses they were under oath and inviting their respective attorneys to talk to them about testifying truthfully. Gonzalez cites no case holding that the mere act of reminding a witness she has an obligation to testify truthfully, or inviting a witness's counsel to discuss the consequences of perjury with her client, qualifies as a due process violation or otherwise constitutes misconduct. Indeed, the case law is to the contrary. (Cf. *People v. Harbolt* (1988) 206 Cal.App.3d 140, 155 [no misconduct where prosecutor's "comments . . . amounted to a 'mere warning' about the dangers

---

[14]  The court invited Rowan's attorney to remind her client she was "supposed to be telling the truth and volunteering answers without the prosecutor having to constantly remind her of what her statements have been in the past." After Celina repeatedly testified that she could not remember whether Gonzalez had said he was carrying a gun at the time of the murder, and then asked the prosecutor why he kept asking her that question, the trial court directed her not to ask the prosecution questions and then asked Celina's attorney whether she would "wish to talk to [her] client."

of perjury"]; *Williams v. Woodford* (9th Cir. 2004) 384 F.3d 567, 603 [" 'merely warning a witness of the consequences of perjury' does not unduly pressure the witness's choice to testify or violate the defendant's right to due process"].)

The primary authority Gonzalez relies on, *Webb v. Texas* (1972) 409 U.S. 95 (*Webb*), has little in common with this case. In *Webb*, the trial court, acting in the presence of the jury, told the defense's only witness that he did not have to testify and further directed that if he lied under oath, the court would "personally see" to it that the grand jury would indict him for perjury and that he would likely be convicted and sentenced to several years in prison (and also impair his chances for parole). (*Id.* at pp. 95–96.) After receiving this warning, the witness chose not to testify. The Supreme Court found that such conduct violated the defendant's right to due process, explaining that the "lengthy admonition" had gone far beyond merely warning the witness of the "necessity to tell the truth," and had instead used "unnecessarily strong terms [that] could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." (*Id.* at pp. 97, 98.)

Nothing similar occurred here. The trial court in this case merely called the witness's attention to the importance of testifying in a truthful manner and, outside the presence of the jury, invited each witness's counsel to consult with their client about "telling the truth and volunteering answers without the prosecutor having to constantly remind her of what her statements have been in the past." We see nothing in these admonitions that was so extreme as to amount to a due process violation.

We likewise find that Gonzalez has failed to establish that the prosecution engaged in unlawful coercion by reminding the witnesses they were under oath, referencing prior statements they had made to law enforcement and, on a single occasion, inquiring whether Rowan was aware that she was facing a three-year jail sentence. Again, Gonzalez cites no authority in which similar statements were found to constitute prosecutorial misconduct. The primary authority he cites is *United States v. Juan* (9th Cir. 2013) 704 F.3d 1137, 1142 (*Juan*), which held that under the "principles of *Webb*[*, supra*, 409 U.S. at page 95]," a prosecutor's "substantial and wrongful interference with a . . . witness that . . . leads the witness to materially change his or her prior trial testimony can . . . violate due process." (*Ibid.*)[15]

We find nothing in the prosecution's conduct that amounted to "substantial and wrongful interference" with the witnesses' testimony. (*Juan, supra,* 704 F.3d at p. 1142.) When faced with two hostile witnesses who had provided testimony that was inconsistent with their prior statements to law

---

[15] Gonzalez also cites *People v. Medina* (1974) 41 Cal.App.3d 438, which held that an immunity agreement requiring the cooperating witness to provide testimony that was materially identical to the statements he had previously made to police was constitutionally impermissible. We have clarified that the principles of *Medina* are implicated only when "the bargain is expressly contingent on the witness sticking to a particular version . . . ." (*People v. Garrison* (1989) 47 Cal.3d 746, 771.) Rowan and Celina were not subject to any such requirement. Instead, their plea agreements provided only that they would testify truthfully. (See *People v. Allen* (1986) 42 Cal.3d 1222, 1252 ["although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid"].)

enforcement, or otherwise claimed not to remember key aspects of what they had told police, the prosecution reminded them of their prior statements or their duty to testify truthfully. Those reminders do not qualify as misconduct. Likewise, the isolated question the prosecution asked Rowan about whether she wanted to receive a three-year sentence was not so extreme as to substantially interfere with her testimony or otherwise "involve[] the use of deceptive or reprehensible methods." (*Morales, supra,* 25 Cal.4th at p. 44.) Under "the totality of the circumstances" presented here (*Juan, supra*, 704 F.3d at p. 1142 ["substantial interference inquiry is [assessed] under the totality of the circumstances"]), we find no witness interference nor any misconduct in the prosecutor's limited admonitions to the witnesses.[16]

---

[16] It is also unclear what prejudice Gonzalez could have suffered from such conduct. Gonzalez's central contention seems to be that in the absence of the prosecution's admonitions about providing truthful answers, the witnesses might have provided testimony that differed from what they had previously told the police. But as the witnesses acknowledged at trial, they had made several recorded statements to law enforcement along with "a proffer under oath about things that occurred." Thus, had the witnesses testified in a manner that was inconsistent with what they told police, which is apparently what Gonzalez contends they would have done had the court and prosecutor not "interfered" with them, the prosecution would have been able to cross-examine them with their prior conflicting statements, many of which were made under oath. The jury would therefore know their current testimony conflicted with prior statements they had made to law enforcement.

### 7. *The court did not improperly restrict cross-examination*

Gonzalez also argues the trial court violated his right to confrontation when it sustained objections during the cross-examinations of Rowan and Celina. We find no error.

#### *a. Background*

During cross-examination, defense counsel asked Rowan if she was concerned "whether or not [she was] going to get a deal on [her] case" and if she was afraid of going to prison for three years. She responded yes. Defense counsel then asked, "You don't want to go to prison for three years, do you?" Rowan responded no.

Defense counsel then asked Rowan, "So you're trying to make sure that you say everything that the prosecutor wants you to say, aren't you?" The prosecution objected to the question as argumentative, and the trial court sustained the objection. Defense counsel attempted to reframe her question several times, asking Rowan if she was giving testimony that she thought would "be pleasing to the prosecutor"; whether she was "trying to make sure [she said] anything that the prosecution want[ed] [her] to say"; and whether she was concerned that she would spend three years in prison if the prosecution "is not in agreement with what [she] said." The trial court sustained objections to all these questions.

During a sidebar, defense counsel explained she was trying to ask Rowan if the testimony she had provided on direct examination was "tainted by the fact that if the prosecutor [is] not in agreement, she will get her three years." The trial court stated, "You can ask her that. That's a different question. You can certainly ask her that, yes." Following the sidebar, defense

counsel asked Rowan, "Is your testimony here today given in such a way that you feel will cause you not to get three years in state prison?" Rowan answered yes. Defense counsel then asked Rowan, "So you are concerned about what you say here today may affect you in terms of getting the three years in state prison?" Again, Rowan answered yes.

When cross-examining Celina, defense counsel engaged in a similar line of questioning, inquiring whether she was "concerned about [what] sentence [she] might get." Celina answered yes. Defense counsel then asked, "And you want to agree with the prosecutor; isn't that right?" The prosecution objected to the question as argumentative, and the trial court sustained the objection. Defense counsel asked Celina if the prosecution "has some control over what kind of sentence you get?" The prosecution objected on relevance grounds and the trial court sustained the objection. Defense counsel then asked Celina, "Do you feel that the prosecutor may make an argument at your sentencing time with respect to what sentence you may get?" Celina responded yes. Counsel also asked her if she "want[ed] to give testimony that will help [her] out at [her] sentencing." Celina again answered yes.

### b. Discussion

Gonzalez contends the trial court violated his right to confrontation by improperly limiting the cross-examination of Rowan and Celina. (See *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 476 [a defendant "possesses a fundamental right to confront the witnesses against [him]. [Citations.] Cross-examination is a cornerstone of that fundamental right"].) To establish such a claim, Gonzalez must show he was "prohibited from engaging in otherwise appropriate cross-examination

designed to show a prototypical form of bias on the part of the witness." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 (*Van Arsdall*).) A trial court maintains " 'wide latitude insofar as the Confrontation Clause is concerned to impose limits' " on cross-examination. (*People v. Mendez* (2019) 7 Cal.5th 680, 703) " ' "[U]nless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witness's] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 455–456.)

Gonzalez argues the trial court improperly prevented counsel from asking questions that were intended to show the testimony Rowan and Celina provided on direct examination was meant to "please the prosecutor" so that the prosecutor "would not incarcerate them for three years." The record shows, however, that the defense *was* permitted to ask questions that elicited that very information. After a sidebar, defense counsel was permitted to ask Rowan whether she was worried that her answers to the prosecutor's questions might affect her "in terms of getting three years in state prison" and whether she had "given [her testimony] in such a way that . . . [would] cause [her] not to get three years in prison." She responded affirmatively to both questions. Counsel was permitted to elicit similar testimony from Celina, inquiring whether the answers Celina had provided on direct examination had been made "to help [her]self out at [her] sentencing." Counsel was also permitted to ask Celina whether she "want[ed] to give testimony that [would] help [her] out at [her] sentencing."

Thus, the record makes clear defense counsel was allowed to ask Rowan and Celina questions that were intended to

examine whether the answers they provided on direct examination were tainted by their desire to secure a lesser sentence. While the trial court prohibited the defense from asking differently phrased questions that were meant to examine that same issue, we fail to see how those questions would have produced "a significantly different impression" (*Van Arsdall, supra*, 475 U.S. at p. 680) of the witnesses' credibility.

### 8. *The trial court did not err in admitting Gonzalez's statements regarding a crime involving a Mercedes*

Gonzalez argues the trial court should have excluded a video clip in which he and undercover detective Javier Clift were shown discussing a crime involving a Mercedes. In an earlier portion of their recorded conversation (the admission of which Gonzalez has not contested), Clift and Gonzalez discussed Gonzalez's participation in a serious, possibly capital, offense that appeared to match the circumstances of Rosa's murder. In the clip Gonzalez challenges here, Clift asks Gonzalez why he was transferred from prison. Gonzalez responded, "I hope it's for the Mercedes. I'll be like, I'll take it Your Honor. Give it to me. How much 7, 10, 15, 20? Anything else." Clift and another detective who also heard Gonzalez discussing this crime both described it as a "carjacking."

Defense counsel argued the statements Gonzalez made in the clip were inadmissible because they referenced another crime that was unrelated to Rosa's murder. The prosecution, however, contended the statements qualified as a "form of admission." The trial court agreed, concluding that the evidence was intended to show "a guilty frame of mind in that he's hoping his current incarceration is not for the murder of the named victim in this case, but for a car theft instead. So that the other

crimes evidence can be instructed away in the sense that the jury would be advised they are not to consider it, but only consider it as to his state of mind with respect to his knowledge of this crime." In response, defense counsel argued the clip might be admissible if Gonzalez had referenced the murder, but he had only mentioned the carjacking. The trial court disagreed, explaining, "Well its implicit. It's an adoptive admission. Even if Gonzalez is not mentioning the murder, it is implicit that that is what the discussion is about."

On appeal, Gonzalez argues that the clip should have been excluded because: (1) it was not relevant to the charged crime; (2) the sole purpose of the evidence was to show Gonzalez's bad character (see Evid. Code, § 1101, subd. (a)); (3) Gonzalez's statements did not qualify as adoptive admissions and therefore should have been excluded as hearsay; and (4) even if otherwise admissible, the evidence was more prejudicial than probative, and thus inadmissible under Evidence Code section 352. We review each of these claims under the abuse of discretion standard. (*People v. McKinnon* (2011) 52 Cal.4th 610, 655 ["On appeal, we review for abuse of discretion a trial court's ruling on whether evidence is relevant, not unduly prejudicial, and thus admissible"]; *People v. Memro* (1995) 11 Cal.4th 786, 864 ["We review the admission of evidence under Evidence Code section 1101 for an abuse of discretion"]; *People v. Rogers* (2013) 57 Cal.4th 296, 326 (*Rogers*) [" ' "Rulings made under [Evidence Code sections 1101 and 352, including those made at the guilt phase of a capital trial] are reviewed for an abuse of discretion" ' "]; *People v. Martinez* (2000) 22 Cal.4th 106, 139 ["we apply the abuse of discretion standard when reviewing a trial court's decision that evidence falls within a hearsay exception"].)

57

"Relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' [Citation.] ' "The test of relevance is whether the evidence tends, 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." ' " (*People v. Wilson* (2006) 38 Cal.4th 1237, 1245.) We find no abuse of discretion in the trial court's determination that, understood in context, Gonzalez's statements regarding the carjacking tended to establish his identity as a participant in Rosa's murder. As explained above, the recordings showed that before Gonzalez referenced the carjacking, Clift and Gonzalez had been discussing a serious crime that matched the circumstances of Rosa's murder. The fact that Gonzalez subsequently expressed hope that he had been transferred to the prison for an unrelated carjacking and would be pleased to be facing a sentence of only 20 years in prison, raises an inference that he committed the more serious crime he had been discussing with Clift.

Moreover, contrary to Gonzalez's assertions, the record makes clear there was a purpose for introducing his statements about the carjacking other than to show bad character or disposition to commit the charged offense. As the trial court explained, the statements tended to show that Gonzalez believed the other crime he had committed, which matched the circumstances of Rosa's shooting, was a more serious crime. (See Evid. Code, § 1101, subd. (b) ["Nothing in this section prohibits the admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as motive, . . . knowledge, [or] identity . . . ) other than his or her disposition to commit such an act"].)

We likewise find no abuse of discretion in the trial court's decision to admit the statement as a form of admission. While perhaps inaccurately described as an *adoptive* admission (which is generally understood to mean a "statement [made] by someone other than the defendant . . . if the defendant 'with knowledge of the content thereof, has by words or other conduct manifested his adoption [of] or his belief in its truth' " (*People v. Davis* (2005) 36 Cal. 4th 510, 535)), the statement was clearly admissible under Evidence Code section 1220 as a "statement[] of a party." (*People v. Horning* (2004) 34 Cal.4th 871, 898 (*Horning*); see *ibid.* [declining to consider the defendant's assertion that statement did not qualify as a "statement[] against interest" because the statement was "clearly" admissible as the "statement[] of a party"].) While "sometimes referred to as the exception for admissions of a party," Evidence Code section 1220 "covers all statements of a party, whether or not they might otherwise be characterized as admissions." (*Horning,* at p. 898, fn. 5, italics omitted; see *Davis,* at p. 535 ["[a] defendant's own hearsay statements are admissible"].) Because Gonzalez was the declarant of the statement and the statement was offered against him, it was not inadmissible under the hearsay rules. (See *Horning,* at p. 898 [hearsay rule does not bar statements when the " 'defendant was the declarant, the statements were offered against him, and he was a party to the action' "].)

Finally, we find no abuse of discretion in the trial court's determination that the evidence was more probative than prejudicial. (See *Rogers, supra,* 57 Cal.4th at p. 326.) " 'Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is

probative of a defendant's guilt.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 133.) Our courts have acknowledged that "[a] limiting instruction can ameliorate section 352 prejudice by eliminating the danger the jury could consider the evidence for an improper purpose." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 247; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83 [juries are presumed to follow the trial court's instructions].)

In this case, the trial court acknowledged it would provide a limiting instruction directing the jury that evidence of other crimes was not relevant for bad character or predisposition. Moreover, the "other crime" referenced in the video clip was far less inflammatory than the murder Gonzalez was being tried for; indeed, Gonzalez's videotaped statements described the incident involving the Mercedes as merely taking someone "for a little ride." (See *People v. Case* (2018) 5 Cal.5th 1, 41 ["The danger of undue prejudice is . . . lessened if evidence of the uncharged acts was 'no more inflammatory than the testimony concerning the charged offenses' "].) Gonzalez, in turn, has provided no explanation why the probative value of this other crimes evidence was substantially outweighed by the probability that it would create a substantial danger of undue prejudice. Instead, he merely states in conclusory fashion that the other crimes evidence would be more prejudicial than probative. (Cf. *Bryant, supra,* 60 Cal.4th at p. 382 ["reject[ing] . . . conclusory" arguments raised in defendant's brief]; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 ["Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error"].) For all

those reasons, Gonzalez has failed to establish the trial court abused its discretion in admitting the clip.

> *9. Gonzalez has failed to establish any error regarding the admission of oral testimony describing the conversations depicted in the video clips*

Gonzalez argues the trial court erred when it allowed several of the detectives who participated in the undercover operation to testify about the conversations depicted in the video clips that were shown to the jury. The testimony was intended to provide context about how the conversations arose, clarify what was being discussed, and explain the meaning of certain slang terms. As one example, the prosecution asked a testifying detective to identify who he understood Gonzalez to be talking about in a video clip where Gonzalez references "the White boy." The detective testified that Gonzalez was referring to Flint and then explained his basis for that belief. In another exchange, a detective was asked what he was referring to in a portion of a video where the detective was heard saying, "it's got to come out sooner or later." The detective responded that he was referring to "the murder of Rosa," and then explained that he had been talking about that subject with Gonzalez for the entire day. The detectives also explained the meaning of certain slang terms like "hooda" (a police officer (see *ante*, at p. 5)) and "cappa" (a person who has committed a crime that would subject him to capital punishment (*ibid.*)).

Gonzalez initially contends that the detectives' testimony violated the "secondary evidence rule" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 269), which generally prohibits the admission of oral testimony to prove the content of writings. (See Evid. Code, §§ 1521, 1523; *People v. Panah* (2005) 35

Cal.4th 395, 475 (*Panah*) [a videotape is a writing for purposes of the secondary evidence rules].)  We disagree.

First, it is undisputed that the jury was shown the writings in question (in this case videos), and Gonzalez has cited no case in which the secondary evidence rule was applied when the writing itself was admitted into evidence.  (See *Panah*, *supra*, 35 Cal.4th at p. 475 ["The purpose of the best evidence rule is 'to minimize the possibilities of misinterpretation of writings by requiring the production of the original writings themselves, if available' "]; *People v. Son* (2020) 56 Cal.App.5th 689, 696 ["Defendant has not pointed to any case in which the secondary evidence rule was applied even though the writing itself was admitted into evidence, nor are we aware of any such case"].)  Second, as the trial court observed, the purpose of the detectives' testimony was not to prove the actual words that were said in the video, but rather to give general context as to the subject matter of the conversations that were depicted in the recording and explain the meaning of some of the terms the speakers used.  (See *Son,* at p. 1170 [officer's testimony "highlight[ing] important details" of a video were not intended to prove the content of the writing and thus did not violate secondary evidence rule].)

Gonzalez separately contends that even if the secondary evidence rule is inapplicable, the detectives' testimony describing the nature of the conversations shown on the videos "served only to 'invade the province of the jury,' which was perfectly capable of drawing their own conclusion" about the subject matter of those conversations.  Although Gonzalez has not identified exactly which statements he believes should have been excluded, we understand his claim to challenge those portions of the detectives' testimony in which they conveyed

what they understood Gonzalez to be discussing during certain parts of the video.[17]

We will assume Gonzalez has preserved this claim and reject the argument on its merits.[18] "A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony." (*People v. Farnam* (2002) 28 Cal.4th 107, 153, citing Evid. Code, § 800.) "A trial court's ruling on the admission or exclusion of [such] evidence is reviewed for abuse of discretion." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 131.) The detectives' description of what they understood Gonzalez to be discussing was based on the prior conversations they had overheard in the holding cell. Thus, the testimony was clearly predicated on their personal observations. Moreover, the trial court could reasonably conclude such testimony aided the jury in understanding what the detectives believed they had observed. Gonzalez has cited no authority finding similar testimony — i.e., witness

---

[17] Gonzalez's brief clarifies that he is not challenging the portion of the detectives' testimony explaining "certain gang terms that had to be translated so that the jury could understand their meaning."

[18] Although Gonzalez's brief cites to numerous pages in the trial transcript where defense counsel made objections during the detectives' testimony, the record shows that most of those objections are unrelated to the argument he presents here ("objection, that's vague"; "objection, that would be speculation"; "[this testimony] is cumulative"; "objection, leading"). In only one instance did Gonzalez object to a statement on the basis that the witness had improperly conveyed "a conclusion." (See *People v. Marks* (2003) 31 Cal.4th 197, 228 ["A general objection to the admission . . . of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal"].)

statements that merely explain the context of a conversation — to be inadmissible. We find no abuse of discretion in the trial court's decision to admit what amounted to lay opinion testimony.

## B. Penalty Phase Issues

### 1. *Gonzalez has failed to establish error with respect to the admission of his statements referencing other crimes*

Gonzalez challenges the admission at the penalty phase of two video clips recorded during the undercover operation.

#### a. *Background*

Gonzalez sought to exclude a video clip in which he made statements "concerning his participation in some otherwise unspecified carjacking involving a Mercedes." The defense objected on the grounds that: (1) the video was cumulative of evidence the prosecution had presented during the guilt phase; and (2) the evidence only tended to prove a general propensity to commit crime. The prosecution argued the video was admissible as evidence of criminal activity involving the use of force (see § 190.3, factor (b)). The trial court overruled the objection.

Gonzalez also challenged the admission of a video clip in which he told an undercover officer he had been involved in 27 armed robberies as a juvenile. Defense counsel objected that although the video contained a statement in which Gonzalez referenced having committed 27 robberies, the prosecution only intended to introduce corroborating evidence of some of those incidents. Counsel argued that because the prosecution had provided no "foundation for these so-called 27 robberies," and could not "prove the corpus on all of these 27 robberies," it was improper to admit a statement referencing that number of

robberies. The trial court agreed it was improper to include the portion of the statement referencing 27 robberies since the prosecution did not actually intend to prove each of those robberies. The court provided the prosecution the option of deleting the reference to the number of robberies or excluding the clip altogether. The prosecution explained that it intended to remove the portion of the clip referencing the number of robberies and defense counsel posited no further objection. The prosecution thereafter played the two clips and presented several witnesses who testified about a carjacking involving Gonzalez and numerous robberies that he was believed to have committed.

### b. Discussion

On appeal, Gonzalez argues that that while evidence of criminal activity involving the use of force is generally admissible at the penalty phase (see § 190.3, factor (b)), the trial court should have excluded the video clips referencing the carjacking and the string of robberies under the corpus delicti rule, which applies to the use of factor (b) crimes. (See *Valencia, supra,* 43 Cal.4th at pp. 296–297; see *ante*, at pp. 15–16 [explaining the corpus delicti rule].) According to Gonzalez, the prosecution failed to identify any evidence apart from his own statements indicating that the carjacking or the robberies actually occurred.

The Attorney General argues that Gonzalez has forfeited any argument that such evidence was inadmissible under the corpus delicti rule because he failed to raise any such objection at the trial court. We agree that Gonzalez has forfeited the particular claims he raises here. Regarding the recorded statements referencing a carjacking, defense counsel never

raised a corpus delicti objection. (See *Horning, supra*, 34 Cal.4th at p. 899 [defendant forfeited argument that "the prosecution did not establish the corpus delicti of the [uncharged offense]"].)

Regarding the video referencing the robberies, defense counsel made it clear he was objecting to the portion of the video in which Gonzalez stated that he had committed 27 robberies. Such evidence was improper, defense counsel asserted, because the prosecution only intended to present independent evidence of some of those robberies, and thus "could not prove the corpus on all . . . 27 robberies." The trial court agreed and made the prosecution remove the reference to the number of robberies. If defense counsel believed this was an insufficient remedy, and that the video clip should be excluded even with that modification, it had a duty to raise that argument with the court.

Moreover, the prosecution presented sufficient evidence to establish the corpus delicti of both a carjacking and multiple robberies. Regarding the carjacking, the prosecution presented testimony from a victim who stated that he had been taken to a house where he was carjacked. A detective testified the victim of the carjacking had picked Gonzalez out of a photo array. When describing the carjacking incident to undercover agents, Gonzalez had stated that the carjacking victim had been brought to a house, which matched the victim's description of the incident. Finally, Rowan testified that after Gonzalez had told her about the carjacking, she had seen him driving a car that was similar in appearance to the one he had described to her.

Regarding Gonzalez's admission that he had committed robberies as a juvenile, the prosecution presented testimony

from numerous victims who were robbed at gunpoint along with testimony from an investigating officer verifying that several of the victims had identified Gonzalez as the perpetrator. (See *ante*, at p. 10.) This evidence justified the admission of Gonzalez's statement that he had committed multiple robberies.[19]

### 2. *The improper aspects of the victim impact video were harmless*

Gonzalez challenges the admission of an eight-minute video in which Rosa's friends and colleagues provided emotional statements lauding their relationship with her and describing the pain and loss they experienced from her death. Many of the participants spoke from a cemetery with music playing in the background. At times, the audio of the participant's tributes was juxtaposed with photos of Rosa. Several of the participants in the video also provided victim impact testimony during the penalty phase of the trial.

In assessing Gonzalez's objection to the video, the trial court explained that it did "not find [the video] dramatic or of the sort that would cause one to cry," nor did the video contain

---

[19] Gonzalez's contention that his admissions regarding the carjacking and his prior robberies should have been excluded also appears to rely on an aspect of the corpus delicti rule that has been abrogated. As noted above (see *ante*, at p. 16, fn. 3), we have previously held that article I, section 28, subdivision (d) of the California Constitution abrogated the corpus delicti rule "insofar as [it] restricts the *admissibility* of incriminatory extrajudicial statements by the accused." (*Valencia, supra,* 43 Cal.4th at p. 297, italics added.) Thus, the rule no longer operates to exclude evidence of a defendant's extrajudicial statements. (*Ibid.* ["the corpus delicti rule no longer prevents admission of the confession"].)

"irrelevant information or inflammatory rhetoric that diverted the jury's attention from its proper role or invite an irrational, purely subjective response."  In the court's view, the video was not "highly emotional in any sense.  None of [the people in the video] seemed anything other than smiling and happy reminiscing about a lost friend or lost relative depending upon who was talking."  The court also rejected the argument that individuals in the video were cumulative of those same witnesses testifying in court.

Although we have not adopted any "bright-line rules" (*People v. Prince* (2007) 40 Cal.4th 1179, 1288) "pertaining to the admissibility of videotape recordings of victim interviews" (*ibid.*), we have warned that "courts must exercise great caution in permitting the prosecution to present victim-impact evidence in the form of a lengthy videotaped or filmed tribute to the victim" (*id.* at p. 1289).  While it is appropriate to use a video " ' " 'reminding the sentencer . . . [that] the victim is an individual whose death represents a unique loss to society' " [citation], . . . the prosecution may not introduce irrelevant or inflammatory material that " 'diverts the jury's attention from its proper role or invites an irrational, purely subjective response.' " ' " (*People v. Kelly* (2007) 42 Cal.4th 763, 794 (*Kelly*).)  We have highlighted some characteristics of victim impact videos that can be especially problematic:  "Particularly if the presentation lasts beyond a few moments, or emphasizes the childhood of an adult victim, or is accompanied by stirring music, the medium itself may assist in creating an emotional impact upon the jury that goes beyond what the jury might experience by viewing still photographs of the victim or listening to the victim's bereaved parents." (*Prince*, at p. 1289.)  Whether

the admission of such evidence constitutes error must be considered "under the circumstances" of each case. (*Ibid.*)

While we normally review for ourselves the content of such videos, we accord some deference to the trial court's decision to admit the tape when, as here, the record confirms that the court viewed the videotape, considered its possible improper emotional effects and exercised its discretion to allow it. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 366 (*Zamudio*).) Where the videotape includes impermissible elements, we assess whether those elements separated from the permissible features of the videotape prejudiced defendant. (See *Kelly*, *supra*, 42 Cal.4th at pp. 798–799.)

We have viewed the videotape and find that it does contain some improper features. The music in the video has no apparent relevance other than to enhance the emotional effect of the video. (See *People v. Sandoval* (2015) 62 Cal.4th 394, 442 (*Sandoval*) ["because background music in victim impact presentations provides no relevant information and is potentially prejudicial, it is never permitted"]; *Kelly*, *supra*, 42 Cal.4th at p. 798.) Many of the individuals in the video offering testimonials are in a cemetery, and the camera moves toward them at times to draw attention to their emotional responses. (See *ibid.* ["Trial courts must not permit irrelevant . . . video techniques that enhance the emotion of the factual presentation"; "The videotape must . . . not present a 'staged and contrived presentation' "].) Because these features of the video had no apparent purpose other than to increase the viewer's emotional response, the trial court should have ordered the prosecution to remove them.

However, "we find 'no reasonable possibility' that the jury would have reached a different penalty verdict if [these objectionable features] had been omitted." (*Sandoval, supra*, 62 Cal. 4th at p. 442.) During the penalty phase, the prosecution presented voluminous testimony from many witnesses describing numerous violent crimes that Gonzalez had perpetrated against them. Those crimes involved a string of armed robberies that occurred in 1994, two shootings that occurred in 2006 (one of which left the victim with five bullet wounds), an armed carjacking and an attack on a prison guard. (See *ante*, at pp. 10–11.) Moreover, apart from the victim impact video, the jury heard extensive in-person victim impact testimony from coworkers, friends and family members, some of whom also appeared in the video. Those witnesses described, among other things, Rosa's strong work ethic, her bright and kind personality, her willingness to help other people and their profound sense of loss when she was killed. Rosa's partner described how they met, their life together and their plans for adopting a child. Rosa's sister described their close relationship and Rosa's early life. (See *ante*, at p. 12.) Accordingly, even without the video, the jury would have heard much of the same type of emotional testimony. Given all this evidence, "we see no reasonable possibility [that the objectionable] portions of the videotape affected the penalty determination." (*Kelly, supra*, 42 Cal.4th at p. 799.)[20]

---

[20] Gonzalez also argues that the video impermissibly called for vengeance. Because the video contains no explicit calls for vengeance, we reject the claim. (See *Kelly, supra*, 42 Cal.4th at p. 797 ["the tape expressed no outrage over her death, just implied sadness. It contained no clarion call for vengeance"].)

### 3. *Constitutionality of the death penalty*

Gonzalez challenges the constitutionality of California's death penalty statute and implementing statutes on numerous grounds that we have previously rejected. We decline to reconsider our previous holdings that:

(i) " '[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court' " (*People v. Dalton* (2019) 7 Cal.5th 166, 267 (*Dalton*));

(ii) " 'section 190.3, factor (a), on its face or as interpreted and applied, [does not] permit arbitrary and capricious imposition of a sentence of death' " (*Dalton, supra,* 7 Cal.5th at p. 267);

(iii) " '[t]he death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing . . . or constitute cruel and unusual punishment on the ground that it does not require either unanimity as to the truth of aggravating circumstances or findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence.' [Citation] Nothing in *Hurst v. Florida* (2016) 577 U.S. [92] . . . , *Cunningham v. California* (2007) 549 U.S. 270 . . . , *Blakely v. Washington* (2004) 542 U.S. 296, . . . , *Ring v. Arizona* (2002) 536 U.S. 584 . . . ., or *Apprendi v. New Jersey* (2000) 530 U.S. 466 . . . , affects our conclusions in this regard" (*Dalton, supra,* 7 Cal.5th at p. 267);

(iv) " '[w]ritten findings by the jury during the penalty phase are not constitutionally required, and their absence does

not deprive defendant of meaningful appellate review' " (*Dalton, supra,* 7 Cal.5th at p. 268);

(v) " '[t]he federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment [citations], do not require intercase proportionality review on appeal' " (*Dalton, supra,* 7 Cal.5th at p. 268);

(vi) " ' "capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating" a defendant's right to equal protection of the laws, due process of law, or freedom from cruel and unusual punishment' " (*Dalton, supra,* 7 Cal.5th at p. 268);

(vii) " ' "[t]he death penalty as applied in this state is not rendered unconstitutional through operation of international laws and treaties" ' " (*Dalton, supra,* 7 Cal.5th at p. 268);

(viii) "the trial court [is not] constitutionally required to instruct the jury that section 190.3's mitigating factors [can] be considered only as mitigating factors and the absence of evidence supporting any one should not be viewed as an aggravating factor" (*People v. Duff* (2014) 58 Cal.4th 527, 570).

## C. Cumulative Error

Gonzalez contends the cumulative effect of errors at the guilt and penalty phase requires reversal. As discussed above, for purposes of the guilt phase, we have assumed that the admission of portions of Juli Watkins's testimony regarding the DNA evidence was error but conclude that any such error was harmless beyond a reasonable doubt. There are no other errors to cumulate with respect to guilt.

For purposes of the penalty phase, we have found that certain aspects of the victim impact video submitted at the

penalty phase may have been unduly emotional or cumulative of other testimony but conclude that any error was harmless beyond a reasonable doubt. There are no other errors to cumulate with respect to penalty.[21]

## III. DISPOSITION

The judgment of the superior court is affirmed.

**GROBAN, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**

---

[21] Although Gonzalez's opening brief asserts that "guilt phase errors that may not be prejudicial to the guilt phase may nevertheless improperly and adversely impact the jury's penalty determination," he has provided no argument or explanation regarding how any of the purported errors that he contends were committed in the guilt phase impacted the penalty determination. (See *People v. Gamache* (2010) 48 Cal.4th 347, 378 [rejective cumulative error claim where defendant failed to show how error that "had no impact on the guilt verdict" "could have affected the penalty phase verdict"].)

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Gonzalez

---

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S163643
**Date Filed:**  December 2, 2021

---

**Court:**  Superior
**County:** Los Angeles
**Judge:** Joan Comparet-Cassani

---

**Counsel:**

Glen Niemy, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Lance E. Winters, Assistant Attorney General, Keith H. Borjon, Jaime L. Fuster, Eric J. Kohm and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Glen Niemy
11 Prescott Street #2
Salem, MA 01970
(207) 699-9713

Lindsay Boyd
Deputy Attorney General
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6012