Filed 2/10/26  P. v. Carney CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C101559 |
| Plaintiff and Respondent, | (Super. Ct. No. P19CRF0097) |
| v. | |
| JONPAUL MICHAEL CARNEY, | |
| Defendant and Appellant. | |

Over several days in February 2019, defendant JonPaul Michael Carney committed multiple sex acts against his stepdaughter, J. Doe, who was 14 years old.[1]  A jury found defendant guilty of genital penetration by a foreign object and two counts of lewd act upon a child, and found true three circumstances in aggravation as to each count. The trial court sentenced defendant to four years, four months in state prison.

---

[1]  The victim is identified as J. Doe in these proceedings.  To protect privacy, we also will refer to some witnesses by their initials or by their relationships to others.  (Cal. Rules of Court, rule 8.90(b)(4), (10) & (11).)  Further undesignated references to rules are to the California Rules of Court.

1

On appeal, defendant argues that (1) the trial court's denial of his motion to discharge retained counsel and for a continuance violated his constitutional rights and requires reversal, (2) the prosecution failed to prove the aggravating circumstances beyond a reasonable doubt, and (3) the trial court's instructions for the aggravating circumstances were unconstitutionally vague. We disagree and will affirm.

BACKGROUND

An amended information charged defendant with sexual penetration by a foreign object (Pen. Code, § 289, subd. (i); count 1),[2] and lewd or lascivious act on a child 14 or 15 years old (§ 288, subd. (c)(1); counts 2 & 3). The information alleged three circumstances in aggravation as to each count: the victim was particularly vulnerable (rule 4.421(a)(3)), the "manner in which the crime was carried out indicates planning, sophistication, or professionalism" (rule 4.421(a)(8)), and the "defendant took advantage of a position of trust or confidence to commit the offense" (rule 4.421(a)(11)).

*Trial—The Prosecution Case*

*Doe's Account*

Doe was born in September 2004. Her biological father died when she was five. Defendant started dating Doe's mother when Doe was two-and-a-half, and married her when Doe was seven. They lived in a three-bedroom apartment in Placerville, California. Defendant and Doe's mother shared one bedroom, and Doe had her own bedroom. Doe came to look upon defendant as a father. She testified that defendant was kind and supportive. Doe liked defendant when they were not arguing, although they argued frequently.

Doe testified that, two or three weeks before the events at issue here, defendant had broken her cell phone during an argument. Defendant and Doe's mother had set up

---

[2] Further undesignated section references are to the Penal Code.

parental controls on Doe's cell phone to block certain apps after certain times, but Doe was able to bypass the controls. She then used a social media account to communicate with a community of people who engaged in "[d]irty role play," where they would role-play at having sexual interactions. When defendant found out, he grew angry and broke Doe's cell phone.

Doe testified that, in February 2019, when she was 14, defendant molested her. These incidents occurred over a five-day period, starting on a Thursday and ending on Monday morning. At trial, she had difficulty remembering what event happened on what day. A video recording of a 2019 law enforcement interview with Doe was played at trial. This interview supplied some of the chronology that follows.

On Thursday, Doe had been on the couch with defendant, who had his arm over her shoulder and had fallen asleep. He touched Doe's breast with his hand. Apparently, having awoken, defendant reached under Doe's shirt and bra and squeezed her breast. He then asked if Doe wanted to go to the bedroom, and she agreed. In the bedroom, defendant placed his hand between Doe's legs, kissed Doe, and touched her vaginal area over her clothing. Doe told him to stop, and he did. Defendant told Doe that he "cared about [her] consent," and "that he wouldn't do anything if [she] told him to stop." Defendant spoke with Doe about consent more than once.

On another occasion, which in her 2019 interview she said occurred on Friday, Doe was watching a movie with defendant when he placed his head in her lap. He pushed her shirt up, kissed her stomach under her shirt, and kissed her chest. He pushed her bra up and kissed her breasts, neck, and sucked on her nipples. He asked her to go to the bedroom, but she declined.

According to her 2019 interview, on Saturday, Doe was in bed, and defendant lay down next to her and kissed her neck. He then touched her breasts, first over her clothes and then under. He lifted her shirt and kissed and sucked on her breasts. He then inserted two fingers in her vagina. He asked her to touch his penis, and she did. He then

3

said he was leaving and stood up, but then said, "first I need to see your pussy." He took off her underwear, spread her legs, "just kind of looked," and then left.

On Sunday, Doe was under a comforter on the couch between her mother, who was napping, and defendant, when defendant reached under Doe's sweater and touched her breast. He kissed Doe's neck and rubbed her vagina over her clothes. He "went back and forth between" her breasts and vagina, touching her breasts under her clothes and her vagina over her clothes. This stopped when Doe's mother woke up.

On Monday morning, defendant waited for Doe's mother to leave, and then he kissed Doe's neck and touched her breasts over her clothes. He pulled down Doe's pants and underwear, kissed right above her vagina, looked at her vagina, smiled, and walked away.

When Doe went to school that Monday, she wrote, "My stepdad is touching me," on a postcard and showed it to two friends, A.H. and A.P. Later, Doe told them that defendant had touched her inappropriately. A.H. could see Doe was scared and uncomfortable. A.H. also testified, however, that when she disclosed, Doe was "bare faced," like "there was no . . . real emotion behind it." According to A.P., when Doe disclosed, she was nervous, panicked, worried, and anxious. Doe asked her friends not to tell anyone. Despite the fact that defendant had touched her, Doe thought he was a good person because he had "been [her] dad for 12 years . . . and [she] really wholeheartedly trusted him . . . ." Doe did not want defendant to get into trouble or to go to prison.

A.P. insisted that Doe go home with her, which she did. Doe asked her mother to meet her at A.P.'s house. When Doe's mother arrived, Doe told her that defendant had been touching her. According to both Doe and A.P., Doe's mother responded, " 'No, he didn't,' " or " 'He doesn't do that.' " A.P.'s mother, who was also present, testified that Doe's mother denied everything, and said defendant would never do anything like that. According to A.P.'s mother, Doe's mother was "pissed off" and "said that it was all bullshit." She called Doe a liar and accused her of making the allegations for attention.

4

Doe's mother tried to persuade Doe to come home so they "could figure out a situation that would work," but Doe refused. After Doe's mother left, Doe broke down crying. At some point, Doe told A.P. that she thought the incidents could be her fault because she consented. She said that defendant had asked her if it was okay, and she had said that it was. Doe stayed at A.P.'s house for several nights and then at her grandparents' house. Doe's mother continued to live with defendant, but stayed with Doe on weeknights at the grandparents' house.

When Doe met with detectives, she did not tell them everything defendant did to her because she felt ashamed. She also thought "it was [her] fault" because defendant told her that her "consent mattered to him, so [she] felt like [she] consented to everything that had happened."

*Forensic Examination and DNA*

Julie Langston, a nurse practitioner who worked as a sexual assault forensic examiner, examined Doe on February 26, 2019. Langston took numerous swabs and also collected Doe's DNA. Langston noted raised red bumps on the mons pubis, redness around the clitoral hood, and redness and inflammation in the perihymenal tissue. Langston testified that Doe's condition was consistent with what Doe had reported to law enforcement. Langston's ultimate findings were "nonspecific," meaning that she had found redness around the genitalia, and, while such redness is not normal, it is not specific to sexual assault. She also testified that the majority of sex assault exams result in no findings largely because the tissues in the genital area recover very quickly.

Heather Tomchick, a senior criminalist testifying as an expert, performed initial DNA testing on swabs obtained from Doe. She found no male DNA on swabs from Doe's vestibule and anus. A potential trace amount of male DNA was detected in the swab from Doe's clitoris and labia minora, although this was not a clear indication of the presence of male DNA. Tomchick later performed DNA testing on Doe's sexual assault evidence kit. She found no Y-chromosomes in the swabs taken from Doe's clitoris/labia

5

minora and vulva. Defendant's DNA profile matched that of the major contributor to a DNA mixture found on the swab taken from Doe's breast. Additionally, there were at least two male contributors to the DNA mixture found on the swab taken from Doe's mons pubis, and defendant could not be eliminated as the possible minor contributor.

Tomchick acknowledged that DNA can be transferred from people to objects through contact. She also acknowledged that transfer of biological material in the laundry had occurred in studies involving sperm cells. Tomchick agreed that the transfer of another person's DNA from Doe's clothing to her body was possible.

*Counseling and Recantation*

Meghan Lefkowitz, a licensed social worker, saw Doe in 2019. She made two mandated reports during this time because she suspected sexual and emotional abuse. On April 18, 2019, Doe told her that her mother did not believe her about the sexual abuse, and that Doe had agreed to tell the authorities the abuse had not occurred. On May 9, 2019, Doe indicated that she and her mother had agreed they would tell authorities that Doe had been lying about the abuse. On May 15, 2019, Doe indicated that she had told her friends she sometimes initiated the sexual acts to "feel normal." This upset Doe's friends, who no longer wanted to be friends with her.

Doe acknowledged that she initially told her counselor what defendant had done and then recanted. According to Doe, her mother had made it clear she did not believe Doe and wanted Doe to say that she had lied about the whole situation. Every time the subject came up, Doe's mother made clear that she did not believe Doe. She would say that it is just not something that defendant would do, and that no one who knew him would believe Doe. Doe's mother asked her to recant repeatedly, and, eventually, Doe relented. Doe's mother coached Doe to prepare her for her recantation.

Doe told both her counselor and someone in the district attorney's office that she had made everything up. She denied that defendant did anything to her. She told them

6

that the family was having a lot of trouble at home, and that she made the accusations just to get away. Doe denied that her mother had pressured her to recant.

Doe testified at trial that she recanted so that her mother could keep her husband, because Doe did not want her mother to be alone. Doe also did not want to lose her mother. Doe acknowledged saying in the 2019 law enforcement interview, that she had a history of lying.

*Doe's Mother*

Doe's mother testified that, when Doe told her that defendant had been touching her inappropriately, she was shocked. She testified that it "didn't sound feasible." She believed that "there was some sort of confusion," and "wanted to know . . . whether it was [an] inappropriate joke, inappropriate play, something along those lines, or if it was actually of a sexual nature." Doe's mother acknowledged having doubts about Doe's accusations. She expressed confusion about why this would happen suddenly after defendant had been in their lives for years. She believed the issue may have arisen due to defendant's proclivity for telling sexual jokes. She also might have said that "maybe she was talking about when his hand accidentally bumped her chest and he pulled it away, that she thought he was trying to be sexual with her . . . ." Doe's mother may have told Doe that perhaps she misunderstood what happened. Doe's mother also testified that Doe had a history of lying.

Doe's mother denied telling Doe how she should answer questions in recanting. She might have done online research as to how to articulate that "it never happened." She also performed research on children making false accusations of sexual molestation. Asked if she pressured Doe into recanting, Doe's mother testified, "Not that I can recall." She testified that she told Doe to "tell them the truth."

*Trial-The Defense Case*

Defendant testified that Doe was his stepdaughter, and he had known her since she was two and a half years old. He characterized their relationship as strained but strong.

7

He loved Doe more than anything. He testified that he had "major problems" with Doe lying.

Just before defendant's arrest, his relationship with Doe was shaky. Doe had broken the rules about her cell phone use. Defendant and Doe's mother put a parental control on Doe's cell phone, but Doe found a way to circumvent it. This occurred approximately a week before Doe made the allegations against defendant. Defendant became upset and grounded Doe, and when he discovered that Doe was engaging in dirty role-playing, he broke her cell phone.

Defendant testified that the family laundry was all washed together. He also testified that Doe would often use his towel.

Defendant testified that Doe's allegations were not true.

*Verdicts and Sentencing*

The jury found defendant guilty on all counts, and found true all circumstances in aggravation as to each count. The trial court sentenced defendant to the upper term of three years on count 1, and eight months each on counts 2 and 3, one-third of the middle term, for an aggregate term of four years, four months in state prison.

DISCUSSION

I

*Motion to Discharge Retained Counsel and for a Continuance*

A.    *Motion to Discharge Retained Counsel*

Defendant argues the trial court erred and violated his constitutional rights in denying his motion to discharge retained counsel. We agree with the People, however, that defendant never requested discharge of his retained counsel.

"The right to counsel, enshrined in both the federal and state Constitutions, guarantees a defendant the right to retain counsel of the defendant's own choosing." (*People v. Williams* (2021) 61 Cal.App.5th 627, 631.) The "right to counsel of choice reflects not only a defendant's choice of a particular attorney, but also his decision to

8

discharge an attorney whom he hired but no longer wishes to retain." (*People v. Ortiz* (1990) 51 Cal.3d 975, 983.)

A request to discharge retained counsel does "not necessarily require a proper and formal legal motion, but at least some clear indication by defendant that he wants a substitute attorney." (*People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. 8.) For example, in *People v. O'Malley* (2016) 62 Cal.4th 944, the court determined that "defendant's equivocal statements, combined with the uncertainty expressed by defense counsel and the court as to what he wanted, did not constitute a clear indication he wanted to discharge counsel." (*Id*. at p. 1006; see *id*. at pp. 1002-1003.) The Supreme Court concluded that "the trial court did not erroneously deny a request to discharge counsel because there was no request to be ruled on." (*Id*. at p. 1006.)

Here, at the commencement of sentencing, defense counsel stated: "I'm going to announce that I'm not ready to proceed today for reasons I will articulate when the Court allows me." Defense counsel elaborated: "I was just notified by the family this morning that they are looking into–speaking to another attorney about the issue of ineffective assistance of counsel. That's what they want to do." He continued: "I was advised by my client's family today they're going to speak to an attorney by the name of [named attorney]. They've expressed an interest in having [named attorney] look over my performance of the case and I guess [co-counsel's] as well. [¶] I feel based on the case of People v. Fosselman . . . , the IAC issue must first be resolved. If [named attorney] deems it appropriate, he can then file a motion for new trial. [¶] If we went to judgment and sentencing today, the Court would not have jurisdiction for a motion for new trial. That is my understanding of People v. Fosselman. [¶] And I notified [the prosecutor] within ten minutes as I heard this this morning. So I'm not ready to proceed. I want to preserve every possible constitutional right for my client."

The prosecutor responded: "I don't believe, after a very, very quick review of the Fosselman case, that it stands for the proposition that [defense counsel] has indicated. [¶]

9

If there is to be new counsel, they should be here today, and they are not. All we have is a representation that this is the plan. [¶] The People would object to continuing the sentencing, and we would like to go forward. This victim has been waiting five years for justice, and today we are asking the Court to go forward with sentencing."

The trial court stated that it "normally doesn't put off judgment and sentencing for something that might happen. I don't know if the family is going to retain counsel. Maybe they'll retain counsel. Maybe they won't. After they do retain–assuming they retain counsel and counsel looks at it, counsel may find there's nothing to do." The court continued: "That there's no issue. I'm not going to continue. I don't find this as good cause to continue."

Unlike cases on which he relies, defendant did not make a formal motion to discharge retained counsel. (See, e.g., *People v. Ortiz, supra*, 51 Cal.3d at pp. 980-981.) Furthermore, nothing in the colloquy here amounts to a clear indication that he was requesting the discharge of retained counsel or that he wanted a substitute attorney. Defendant simply did not request that relief.

Discussing whether a defendant made a motion to discharge retained counsel, which was erroneously treated as a *Marsden* motion by the trial court (*People v. Marsden* (1970) 2 Cal.3d 118), the court in *People v. Lara* (2001) 86 Cal.App.4th 139, on which defendant relies, stated: "It is a close question as to whether appellant wanted to discharge Mr. Roberts. At the beginning of the proceedings, Mr. Roberts immediately informed the court that appellant had some complaints about his representation. . . . The court . . . asked Mr. Roberts for clarification as to whether appellant was making a *Marsden* motion. Mr. Roberts stated: 'I don't think [appellant] knows the name, but I have a feeling that is probably what it is.' The court asked appellant if he had 'some question that you want the Court to respond to with regard to a disagreement between you and Mr. Roberts?' Appellant replied he did, and the court cleared the courtroom and conducted the *Marsden* hearing. At the conclusion of the hearing, the court found the

conflict between appellant and Mr. Roberts was a 'tactical difference and doesn't rise to the level in the type of breakdown in the attorney/client relationship that *Marsden* is looking at. And, therefore, . . . I am going to deny your request in the *Marsden* . . . .' " (*Id*. at pp. 157-158.) The appellate court stated: "the trial court obviously interpreted appellant's complaints as sufficient to raise a *Marsden* motion. . . . [T]he trial court is not obliged to initiate a *Marsden* motion sua sponte. [Citation.] The trial court's duty to conduct a *Marsden* inquiry arises 'only when the defendant asserts directly or by implication that his counsel's performance has been so inadequate as to deny him his constitutional right to effective counsel.' [Citations.] The trial court's evaluation of appellant's complaints strongly infers that it was willing to grant the supposed *Marsden* motion and discharge appellant's attorney if the court found an irreconcilable conflict existed between appellant and Mr. Roberts. Instead, the court found appellant and Mr. Roberts merely disagreed about trial tactics, and that such a disagreement was insufficient to support the discharge of appellant's defense counsel. . . . [¶] While the trial court improperly conducted a *Marsden*-type hearing . . . , we may rely on the court's factual interpretation of the situation as involving a request by appellant to discharge his defense attorney and obtain a new attorney to represent him in this matter. We thus conclude that appellant's complaints about his defense counsel were sufficient to implicate his right to discharge his retained counsel, and either hire a new attorney or request the appointment of counsel." (*Id*. at p. 158.)

Here, defense counsel initiated the sentencing discussion by stating he was not ready to proceed. The remedy for this would be a continuance.

Defense counsel then noted that defendant's family was "speaking to another," named "attorney about the issue of ineffective assistance of counsel. That's what they want to do." Defendant's family had "expressed an interest in having" that attorney "look over" retained counsel's performance. These representations indicate only that defendant's family had expressed an interest in the possibility of hiring another attorney

11

in the future. This is no clear indication that defendant was requesting the discharge and substitution of counsel at the sentencing hearing.

Defense counsel then cited and very briefly discussed *People v. Fosselman* (1983) 33 Cal.3d 572, which, insofar as relevant, addressed a motion for a new trial based on ineffective assistance of trial counsel. (*Id*. at pp. 582-584.) It did not involve a request for the discharge of retained counsel.

Counsel concluded: "So I'm not ready to proceed. I want to preserve every possible constitutional right for my client." This statement, too, would be apt as to a request for a continuance, not a request to discharge retained counsel.

None of these representations amounts to a clear indication defendant was requesting the discharge of retained counsel. Moreover, unlike *Lara*, the trial court here did not interpret defense counsel's remarks as indicating a desire to replace counsel. Thus, the trial court's "factual interpretation of the situation" was not that it involved "a request by [defendant] to discharge his defense attorney and obtain a new attorney . . . ." (*People v. Lara, supra*, 86 Cal.App.4th at p. 158.) Instead, both the prosecution and the trial court interpreted the request as one for a continuance.

In his opening brief, defendant asserts—without citing the record—that he "made a timely motion to discharge retained counsel." Appellate briefs must "provide a citation to the record for a factual assertion," and " '[w]e may disregard factual contentions that are not supported by citations to the record [citation] or are based on information that is outside the record.' " (*County of Sacramento v. Singh* (2021) 65 Cal.App.5th 858, 861; see rule 8.204(a)(1)(C).) Defendant argues that the trial court was "misguided" in focusing "on whether ineffectiveness actually existed." Again, defendant does not include a record citation. This may be because nowhere in the colloquy quoted above did the trial court address ineffectiveness in the context of a request to discharge retained counsel.

12

Defendant distinguishes the present circumstances from those in *O'Malley*, arguing that, unlike in *O'Malley*, he "did not want to proceed with defense counsel," he "had not agreed to keep his lawyer," and he had identified a prospective attorney. Even if this matter is distinguishable from *O'Malley* in these respects, defendant has not established that he offered a clear indication that he was requesting the discharge of retained counsel. In this portion of his reply brief, defendant again offers no citation to the record to show that he requested the discharge of retained counsel. The only relevant record citation in this subsection of defendant's reply brief is to show that he identified by name the prospective attorney defendant's family was "going to speak to," having "expressed an interest in having" him review trial counsel's performance. The mere identification of this attorney, whom defendant's family may or may not retain, and who may or may not find grounds for a motion for a new trial based on ineffective assistance of trial counsel, does not constitute a clear request for the discharge and substitution of retained counsel.

Defendant did not move or request to discharge retained counsel. The "trial court did not erroneously deny a request to discharge counsel because there was no request to be ruled on." (*People v. O'Malley, supra*, 62 Cal.4th at p. 1006.)

C.     *Request for a Continuance*

Defendant argues that the "arbitrary" denial of his motion for a continuance violated his constitutional rights. His arguments are based on the premise that his request for a continuance was erroneously denied "in the right to counsel of choice context," and where his request for a continuance was "linked to an assertion of the right to discharge retained counsel . . . ." However, we have concluded defendant did not move to discharge retained counsel. We conclude that the trial court did not abuse its discretion in denying what it deemed to be a request for a continuance.

"The welfare of the people of the State of California requires that all proceedings in criminal cases shall be set for trial and heard and determined at the earliest possible

13

time." (§ 1050, subd. (a).) "[T]he people, the defendant, and the victims and other witnesses have the right to an expeditious disposition, and to that end it shall be the duty of all courts and judicial officers and of all counsel, both for the prosecution and the defense, to expedite these proceedings to the greatest degree that is consistent with the ends of justice." (*Ibid*.) "Continuances shall be granted only upon a showing of good cause." (*Id*., subd. (e).) "Motions to continue the trial of a criminal case are disfavored and will be denied unless the moving party, under . . . section 1050, presents affirmative proof in open court that the ends of justice require a continuance." (Rule 4.113.)

" 'The granting or denial of a motion for a continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge.' " (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 812.) "In exercising its broad discretion, a trial court 'must consider " ' "not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." ' " ' " (*Ibid*.)

An appellate court reviews a trial court's order denying a continuance for abuse of discretion. (*People v. Gonzalez* (2021) 12 Cal.5th 367, 387.) " ' "The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked." ' " (*People v. Navarro* (2021) 12 Cal.5th 285, 330.)

The original complaint in this case was filed on March 1, 2019. Five years later, on April 9, 2024, a jury found defendant guilty on all counts and found true all circumstances in aggravation. What the trial court deemed to be a request for a continuance occurred at the commencement of sentencing on May 24, 2024. Sentencing had already been continued for two weeks at defendant's request. The rationale for a second continuance was that defendant's family was "going to speak" with another

attorney and had "expressed an interest" in having that attorney "look over" whether defendant's trial counsel had been constitutionally ineffective.

The substance of defendant's argument in his opening brief appears to be that the trial court deprived him of a reasonable opportunity to prepare, that the trial court's denial of his request for a continuance was arbitrary, and that the court failed to make "any necessary inquiry directly of" defendant.

With regard to a reasonable opportunity to prepare, defendant cites *People v. Garcia* (2022) 85 Cal.App.5th 290. *Garcia* does provide that, "[a]lthough trial courts enjoy broad discretion to determine whether good cause exists to grant a continuance of trial, such discretion ' " 'may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare.' " ' " (*Id*. at p. 297.) In *Garcia*, newly appointed counsel had less than a week within which to "familiarize herself with the case, prepare the sentencing brief, and marshal facts for and prepare a motion for discovery under the" California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1), which would "necessarily entail[] a fairly thorough review of the trial record . . . ." (*Garcia,* at p. 297.)

Here, there was no newly appointed attorney who had to become familiar with the case and perform involved tasks. Defendant had neither discharged retained counsel nor hired new counsel. His family was reportedly considering engaging an attorney to look at whether trial counsel was ineffective. However, as the trial court emphasized, this was all highly speculative. The court stated that it "normally doesn't put off judgment and sentencing of something that might happen. I don't know if the family is going to retain counsel. Maybe they'll retain counsel. Maybe they won't. After they do retain–assuming they retain counsel and counsel looks at it, counsel may find there's nothing to do." Additionally, there was no indication retained counsel was otherwise unprepared for sentencing.

In *People v. Courts* (1985) 37 Cal.3d 784, the Supreme Court determined that "appellant engaged in a good faith, diligent effort to obtain the substitution of counsel

15

before the scheduled trial date." (*Id.* at p. 791, italics omitted.) Additionally, an attorney-client relationship had been established days before the motion for a continuance, if not earlier. (*Ibid.*) The trial court "was not confronted with the 'uncertainties and contingencies' of an accused who simply wanted a continuance to *obtain* private counsel." (*Ibid.*) In a footnote, the Supreme Court noted that these facts "are to be sharply contrasted with cases which have upheld the denial of a continuance on the ground that participation by a particular private attorney was still quite speculative at the time the motion for continuance was made." (*Id.* at p. 791, fn. 3.) This is just such a case. The trial court did not deprive defendant or his attorney of a reasonable opportunity to prepare.

Defendant argues that the denial of his request for a continuance was arbitrary. He does not explain how. "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' [Citations.] Hence, conclusory claims of error will fail." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

Lastly, defendant refers to the failure of the trial court to inquire directly of him. He relies on *Bland v. California Dept. of Corrections* (9th Cir. 1994) 20 F.3d 1469, 1476, overruled on another ground in *Schell v. Witek* (9th Cir. 2000) 218 F.3d 1017, 1025.) The inquiry at issue in *Bland* pertained not to a request for a continuance, but to a request to substitute counsel. (*Bland,* at p. 1476.) We have concluded defendant did not move to discharge counsel, and *Bland* does not establish a requirement to inquire directly of a defendant in weighing a request for a continuance.

Defendant has failed to satisfy his burden of demonstrating that the trial court abused its discretion in denying his request for a continuance.

16

## II

### *Sufficiency of the Evidence of the Circumstances in Aggravation*

A.     *Defendant's Contentions*

Defendant argues that the jury's true findings on the circumstances in aggravation are not supported by substantial evidence. Of particular relevance here, "[a]n aggravating circumstance is a fact that makes the offense 'distinctively worse than the ordinary.' " (*People v. Black* (2007) 41 Cal.4th 799, 817, overruled on another ground in *People v. Wiley* (2025) 17 Cal.5th 1069, 1076, 1084-1085.) Defendant's specific legal sufficiency argument is that, based on this "distinctively worse than the ordinary" requirement, to prove the aggravating circumstances, the prosecution was required to prove both what an ordinary commission of the underlying crime would be, and that defendant's conduct was distinctively worse than that baseline ordinary commission of the underlying crime. We disagree.

B.     *Standard of Review*

We review the jury's aggravating circumstances findings for substantial evidence, meaning that we "review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence–that is, evidence that is reasonable, credible, and of solid value–supporting the decision . . . . [Citation.] . . . We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

C.     *Proof of an "Ordinary" Commission of the Underlying Crime*

First, we address defendant's argument that the prosecution was required to establish an *ordinary* commission of the underlying crime, and, because it failed to do so,

17

the prosecution failed to prove the circumstances in aggravation beyond a reasonable doubt. We disagree with this premise.

In *Chavez Zepeda v. Superior Court* (2023) 97 Cal.App.5th 65 (*Chavez Zepeda*), the court addressed a vagueness challenge to the aggravating circumstances in rule 4.421. (*Chavez Zepeda*, at p. 71.) The court, considering the "distinctively worse than the ordinary" requirement, concluded that "the abstraction of the 'ordinary case' that troubled the court in [*Johnson v. United States* (2015) 576 U.S. 591] is not equivalent to the 'distinctively worse than the ordinary' standard under California law. Courts applying that standard have not imagined an abstract, 'ordinary case' to determine whether a finding of an aggravating circumstances is warranted by the facts of the case. Rather, they have considered whether the manner of the crime's commission was distinctively worse 'when compared to other ways in which such a crime could be committed.' " (*Chavez Zepeda,* at p. 89.) "Comparing the defendant's commission of the offense with other ways in which the same offense has been or may be committed does not require the decision maker to define a single, imaginary fact pattern as the 'ordinary' way of committing the offense . . . ." (*Id*. at pp. 90-91.) The *Chavez Zepeda* court further stated that, "[w]hen appellate courts have reversed an upper-term sentence on the ground that the cited aggravating circumstance did not make the commission of the crime distinctively worse, they have generally concluded that the circumstance at issue was likely to be present in most any instance of the offense or added little to the wrongfulness already inherent in its commission." (*Id*. at p. 90.)

In the instructional error argument section of his opening brief, defendant asserts in a footnote that *Chavez Zepeda* was wrongly decided, impliedly urging us to depart from its reasoning. We decline to do so. Additionally, we are not persuaded by defendant's efforts in his reply brief to establish that the reasoning in *Chavez Zepeda* is wrong. We agree with the reasoning in *Chavez Zepeda* and conclude that, contrary to defendant's argument, there was no requirement that the prosecution prove "an abstract,

'ordinary' " commission of the underlying crime. (*Chavez Zepeda, supra*, 97 Cal.App.5th at p. 89.)

> D. *Substantial Evidence*

Defendant argues that the "prosecution failed to prove beyond a reasonable doubt that defendant's conduct was distinctively worse when [Doe] consented, voluntarily participated in, and sometimes initiated the conduct." He also emphasizes Doe's participation in "dirty role playing," and that she did not consider defendant's conduct "weird" and was not offended by it.

The jury found defendant guilty of genital penetration of Doe by a foreign object and two counts of lewd act upon a child. Defendant committed multiple sex offenses against Doe concentrated in a span of days. He did not commit a single crime, and he committed his crimes in a sudden spate of sex offenses.

Doe was defendant's stepdaughter, and she had come to look at him as a father. Doe was 14 years old at the time of the offenses, and defendant had been in her life since she was two and a half. Doe's mother entrusted defendant to be the adult at home with Doe when she was at work. These facts support the true findings on the aggravating circumstances that the victim was particularly vulnerable (rule 4.421(a)(3)), and defendant took advantage of a position of trust (rule 4.421(a)(11)).

Defendant typically would await opportunities to commit sex acts when Doe's mother was absent to evade detection and to isolate Doe. This supported the aggravating circumstance that defendant's crimes demonstrated planning. (Rule 4.421(a)(8).)

Doe testified that when defendant penetrated her vagina with his fingers, it lasted "a couple of minutes." However, in her 2019 law enforcement interview, which occurred much closer in time to the offenses, she stated that the episode lasted at least 20 minutes. In that interview, Doe said the instance where defendant kissed and sucked on her breasts lasted 10 or 15 minutes. Defendant's acts were not fleeting or short-lived. Doe had to endure more protracted abuse.

Defendant beguiled Doe into believing she bore responsibility for the sex offenses. He created the illusion of choice and consent in the context of a trusted caregiver committing sex acts against a dependent minor, stating he "cared about" the 14-year-old victim's consent, and that "he wouldn't do anything if [she] told him to stop."

Defendant also carried out these acts within one to three weeks after exhibiting intimidating behavior. Following the fight about Doe engaging in inappropriate activity on her cell phone, defendant got angry and broke Doe's cell phone with his bare hands, breaking "it in half, crushing it inwards."

Viewing the record in the light most favorable to the judgment (see *People v. Jennings, supra*, 50 Cal.4th at p. 638), we conclude that substantial evidence supports the jury's determination that defendant's acts were " 'distinctively worse than the ordinary' " so as to support each true finding on the circumstances in aggravation. (*People v. Black, supra,* 41 Cal.4th at p. 817; see *Chavez Zepeda, supra*, 97 Cal.App.5th at p. 89.)

III

*Instructional Error*

As part of each of the instructions on the circumstances in aggravation, the trial court instructed the jury: "You may not find the allegation true unless all of you agree that the People have proved that the defendant's conduct was distinctively worse than an ordinary commission of the underlying crime." (CALCRIM Nos. 3226, 3230, 3233.) Defendant argues that these instructions were unconstitutionally vague. We disagree.

Defendant did not object to these instructions. However, among other things, defendant argues the matter is reviewable under section 1259 because the error in the instructions affected a substantial right. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights," meaning that the error "resulted in a miscarriage of justice under" *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927; see § 1259.) " 'Ascertaining whether claimed instructional error affected the substantial rights of the

20

defendant necessarily requires an examination of the merits of the claim–at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

"A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

Defendant's vagueness argument, relying much on *Johnson v. United States*, *supra*, 576 U.S. 591, is that the "instructions of 'an ordinary commission of the underlying crime' and 'distinctively worse' conduct failed to establish clear, fixed, minimal legal standards, required persons of common intelligence to necessarily guess at their meanings, allowed the jurors a standardless sweep to pursue personal predilections, and violated the Fourteenth Amendment Due Process Clause." Defendant asks how the jury was to determine what an "ordinary commission of the underlying crime" is, and argues that the prosecution failed to furnish proof of an ordinary commission of the underlying crime by expert evidence or statistics.

As stated, the court in *Chavez Zepeda* rejected the premise, advocated by defendant here, that a court or jury applying the "distinctively worse than the ordinary" standard must "imagine[] an abstract, 'ordinary case' to determine whether a finding of an aggravating circumstances is warranted by the facts of the case." (*Chavez Zepeda*, *supra*, 97 Cal.App.5th at p. 89.) The *Chavez Zepeda* court addressed a constitutional vagueness challenge to the circumstances in aggravation, in part based on the "distinctively worse than the ordinary" language. (*Id*. at p. 71.) That court concluded: "we do not find the requirement that an aggravating circumstance makes the commission of the offense distinctively worse 'when compared to other ways in which such a crime

21

could be committed' [citation] so vague as to place the task beyond any jury's competence and thereby to give rise to unacceptable arbitrariness." (*Id*. at p. 91.) The court further stated: "we do not find that the individual factors listed in rule 4.421 are invalid simply because they use qualitative terms that may not be defined before the jury is instructed, or because they are subject to the requirement that an aggravating circumstance must make the commission of the offense 'distinctively worse than the ordinary.' " (*Id*. at pp. 91-92.)

Defendant is correct that the court in *Chavez Zepeda* did not address a challenge to the jury instructions related to the circumstances in aggravation. (*Chavez Zepeda, supra*, 97 Cal.App.5th at p. 91, fn. 6.) However, we conclude that the reasoning the *Chavez Zepeda* court applied to the aggravating circumstances themselves, and the "distinctively worse than the ordinary" language, applies equally to the highly similar language, "distinctively worse than an ordinary commission," appearing in these jury instructions. And, as stated, defendant has failed to persuade us that the reasoning in *Chavez Zepeda* was wrong. We conclude there is not a reasonable likelihood that these instructions caused the jury to misapply the law in violation of the Constitution. (See *People v. Mitchell, supra*, 7 Cal.5th at p. 579.) Accordingly, defendant's vagueness argument is without merit, and, because there was no error or resulting prejudice, his substantial rights were not affected by the instructions.

## DISPOSITION

The judgment is affirmed.

_____\s\_____,
Krause, J.

We concur:

_____\s\_____,
Robie, Acting P. J.

_____\s\_____,
Duarte, J.